UNITED STATES of America,
Plaintiff–Appellee,

v.

Raul FIGUEROA–LOPEZ, aka: Raul Figueroa Lopez, Defendant–Appellant.

No. 96–50243.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 7, 1997.

Decided Sept. 9, 1997.

Evan A. Jenness, Deputy Federal Public Defender, Los Angeles, CA, for defendant-appellant.

Becky S. Walker, Assistant United States Attorney, Los Angeles, CA, for plaintiff-appellee.

Before: BROWNING, BRUNETTI, and TROTT, Circuit Judges.

TROTT, Circuit Judge:

## OVERVIEW

Raul Figueroa–Lopez ("Lopez") appeals his jury conviction and sentence for possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). Lopez contends that the district court erred by: 1) admitting damaging opinion testimony from law-enforcement officers, who the Government did not qualify as experts, that Lopez's behavior was consistent with that of an experienced drug trafficker; and 2) admitting out-of-court statements of non-witnesses through the Government's informant, in violation of the Confrontation Clause and hearsay rule. Lopez also contends that the Government entrapped him as a matter of law, because the Government's informant induced him to engage in the narcotics transaction in order to obtain repayment of an overdue debt. Finally, Lopez makes several challenges to his sentence.

Although the district court erred by allowing in evidence as "lay opinion" testimony specialized opinion testimony by law-enforcement officers, we conclude that the error was harmless, and we affirm Lopez's conviction and sentence.

## BACKGROUND

### I. The Underlying Offense

At the end of May 1994, federal agents arrested Darryl Storm. Storm and others were charged with conspiracy to distribute cocaine and marijuana, and with money laundering.

Storm agreed to cooperate with the government and provided agents with a list of names of narcotics traffickers known to him. This list included Lopez, although at that time Storm only knew him as "Raul." At the instruction of DEA Agent Sam Larsen, Storm contacted Lopez to explore whether Lopez would sell him some narcotics. Storm met with Lopez on February 1, 1995. Agents attempted to record this meeting, but the audiotape malfunctioned. According to Storm, Storm told Lopez that he wanted to buy 5–10 kilograms of cocaine.

On March 24, 1995, Storm taped a telephone conversation with Lopez, during which Lopez offered to sell Storm ten kilograms of cocaine for $170,000. Lopez and Storm used oblique terminology borrowed from the construction industry to refer to the type, quantity, and price of the drugs.

On March 27, 1995, Storm again met with Lopez. This meeting was not recorded because the recording device malfunctioned again. Lopez gave Storm a sample of cocaine.

During the next month, Storm and Lopez spoke by telephone several times about the impending cocaine deal. These conversations were recorded. On May 25, 1995, Storm called Lopez and arranged to meet later that day to complete the cocaine transaction. Before meeting with Storm, Lopez drove in circles around the parking lot in a Monte Carlo. Storm and Lopez then met in the parking lot. Lopez drove away from Storm and parked next to a silver Nissan

Sentra. Lopez entered the Nissan, bent down for several minutes, and then returned to the Monte Carlo.

Lopez returned to Storm's location and showed Storm a kilogram package of cocaine. Storm gave the arrest signal, and agents arrested Lopez. In the Monte Carlo, the agents found the keys to the Nissan and one kilogram of cocaine on the floor below the front seat. In the Nissan, the agents found nine kilograms of cocaine concealed in the car's door panels.

## II. The Trial

### A. Opinion Testimony

Throughout the trial, the Government presented opinion testimony by law-enforcement witnesses as to how Lopez's conduct, as observed by the agents, conformed to the methods and techniques of experienced drug dealers. Lopez objected to this testimony, claiming that it was "improper opinion testimony," hearsay, lacking foundation, and speculative. He also argued that it was improper expert testimony because the Government had not given prior notice as required by Federal Rule of Criminal Procedure 16(a)(1)(E). The district court overruled all of Lopez's objections and admitted the testimony as *lay* opinion testimony, presumably pursuant to Federal Rule of Evidence 701. The court ruled that the testimony regarding the way Lopez was driving-from which the agent inferred that Lopez was behaving as an "experienced narcotics trafficker"-was admissible notwithstanding Lopez's objections because the officer was a "percipient witness."

The court also overruled without explanation Lopez's objections to Agent Larsen's testimony that: 1) Lopez's actions were "countersurveillance" and "a common practice for narcotics dealers"; and 2) the use of a rental car was "indicative of an experienced narcotics trafficker." In response to Lopez's objection to an agent's opinion as to the street value of the cocaine found in the Nissan, the district court stated that "[t]he Court has repeated over and over that the witness is giving testimony relating to matters in which he has participated and which

he personally observed, and his testimony may incorporate his knowledge and his observations, so on that basis, it will be admitted." Agents repeatedly referred to Lopez's actions as consistent with an "experienced narcotics trafficker." The prosecution relied on this testimony in its closing arguments.

### B. Lopez's Testimony

Lopez testified at trial that, before his arrest on May 25, 1995, he worked as a forklift operator for $10 per hour. He had never been arrested or convicted of any offense. He was 26 years old. In late 1993 or early 1994, Lopez was introduced to an "auto salesman," Tony Sagoo, who took Lopez to an auto auction. Later that day, Lopez gave Sagoo $5,000 to purchase a minivan they had seen. Lopez borrowed much of this money from family members.

Sagoo was unable to purchase the minivan, but he failed to return the $5,000 over the next several months. Sagoo introduced Lopez to Storm and told Lopez that Storm would re-pay the debt. Lopez was "shocked" by Storm's suggestion that they engage in a narcotics transaction as a way to repay the debt. Initially, Lopez refused Storm's suggestions. Eventually, however, Lopez felt pressured and realized that the only way he would get his $5,000 was to complete the drug deal. He therefore agreed to sell cocaine to Storm.

According to Lopez, when Storm asked Lopez for a sample of cocaine, Lopez contacted a friend named "Manny," whom he had met five to six years before in a bar. Lopez got the cocaine from Manny and gave Storm a sample.

Storm continued to pressure Lopez to conduct the transaction, and Lopez acted as a middleman between Storm and Manny. According to Lopez, Manny arranged all the details of the transaction, including the meeting place, the use of two cars, the secret panels, and the price of the ten kilograms.

### C. Storm's Testimony

In response to Lopez's entrapment defense, Storm testified in the Government's rebuttal case that he did not entrap Lopez,

but rather that Lopez was eager to sell him the cocaine.

He also testified that he and Sagoo were involved in a previous marijuana transaction. Sagoo told Storm that Lopez was the supplier. The marijuana from this previous transaction was seized by DEA agents in North Carolina. After agents seized the marijuana, Sagoo told Storm that Lopez claimed that Sagoo owed him $15,000. Storm testified that Sagoo's mother told him Lopez had threatened her concerning payment of the debt. Storm's knowledge concerning Lopez's involvement in the marijuana transaction derived only from these statements.

The district court overruled Lopez's hearsay and relevance objections to the out-of-court statements of Sagoo and his mother. Lopez requested and submitted a limiting instruction to advise the jury that all of this testimony was not admissible for the truth of the matters asserted. The district court refused to give this or any other limiting instruction.

## DISCUSSION

### I. The Law–Enforcement Opinion Testimony

#### A. *The Error*

■ Lopez contends that the district court abused its discretion by admitting without a proper foundation opinion testimony of law-enforcement officers that Lopez's actions were consistent with those of an experienced drug trafficker. Specifically, Lopez contends that the testimony improperly "profiled" him as a drug trafficker and was not the proper subject of lay opinion testimony.

As detailed above, at numerous points throughout Lopez's trial, law-enforcement officers testified:

● that Lopez was engaging in counter-surveillance driving;

● that certain terms used by Lopez and informant Storm were code words for a drug deal, a common practice of narcotics dealers;

● that Lopez's use of a rental car was consistent with the practices of an experienced drug trafficker;

● that the manner of hiding the cocaine was consistent with the practices of experienced drug traffickers; and

● that the large quantity and high purity of the cocaine indicated that Lopez was close to the source of the cocaine.

Lopez vigorously objected throughout this testimony.

A district court's evidentiary rulings during trial are reviewed for an abuse of discretion. *United States v. Sarno*, 73 F.3d 1470, 1488 (9th Cir.1995), *cert. denied*, — U.S. —, 116 S.Ct. 2555, 135 L.Ed.2d 1073 (1996).

If "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue," a qualified expert witness may provide opinion testimony on the issue in question. Fed.R.Evid. 702. The rule recognizes that an intelligent evaluation of the facts by a trier of fact is "often difficult or impossible without the application of some . . . specialized knowledge." Fed.R.Evid. 702 (advisory comm. n.). In this light, we have held that "drug enforcement *experts* may testify that a defendant's activities were consistent with a common criminal modus operandi." *United States v. Webb*, 115 F.3d 711, 713–14 (9th Cir.1997) (emphasis added) (citing cases). This testimony "helps the jury to understand complex criminal activities, and alerts it to the possibility that combinations of seemingly innocuous events may indicate criminal behavior." *United States v. Johnson*, 735 F.2d 1200, 1202 (9th Cir.1984). "Further, we even allow modus operandi expert testimony in cases that are not complex." *Webb*, 115 F.3d at 714 (internal quotation and citation omitted).

The testimony in the instant case is similar to *expert* testimony properly admitted in other drug cases. *See, e.g., United States v. Cordoba*, 104 F.3d 225, 229–30, *amended*, Jan. 1997 (allowing expert testimony that a sophisticated drug dealer would not entrust large quantities of cocaine to an unknowing dupe); *United States v. Espinosa*, 827 F.2d 604, 611–12 (9th Cir.1987) (allowing expert testimony regarding the use of apartments as "stash pads" for drugs and money); *United States v. Patterson*, 819 F.2d 1495, 1507

(9th Cir.1987) (allowing expert testimony on how criminal narcotics conspiracies operate); *United States v. Maher*, 645 F.2d 780, 783 (9th Cir.1981) (per curiam) (permitting expert testimony that defendant's actions were consistent with the modus operandi of persons transporting drugs and engaging in countersurveillance).

In the above cases, the testimony was necessary to inform the jury of the techniques employed by drug dealers in their illegal trade, techniques with which an ordinary juror would most probably be unfamiliar. Thus, the testimony in the instant case could have been admitted as *expert opinion* testimony to inform the jury about the methods and techniques used by experienced drug dealers, *if* the law-enforcement agents had been called as experts and properly qualified as such pursuant to Rule 104 of the Federal Rules of Evidence. In fact, Special Agent Larsen began his testimony with a recitation of his extensive training and experience with the DEA. It appears virtually certain that had the Government opted to do so, Larsen could have been formally qualified as an expert witness on the dispositive issue of whether Lopez's behavior suggested that he was an "experienced"-as contrasted with a fledgling-drug trafficker. However, this routine process did not occur. The testimony was neither offered nor admitted as *expert* testimony, but rather as *lay opinion* testimony. The Government concedes that it made no effort properly to qualify the witnesses as having the knowledge, experience, training, or education to render their testimony admissible under Rule 702.

The Government contends that "the same analysis applies whether the witness is testifying as an expert or as a lay witness." In support of its argument, the Government relies primarily on two cases, *United States v. Fleishman*, 684 F.2d 1329, 1335-36 (9th Cir.1982), and *United States v. VonWillie*, 59 F.3d 922, 929 (9th Cir.1995). The Government's reliance is misplaced.

In *Fleishman*, a DEA agent testified as a lay witness that the defendant was acting as a "lookout." *Fleishman*, 684 F.2d at 1335. A thorough foundation was laid that the agent had extensive training and experience in recognizing whether a person was performing countersurveillance. *Id.* On appeal, the Government argued that the agent's testimony was permissible lay witness testimony under Federal Rule of Evidence 701.[1] The court never directly addressed this argument, stating rather that "whether lay or expert," the testimony was admissible. *Id.* at 1335.

In *VonWillie*, an agent testified "as a lay witness about the nexus between drug trafficking and the possession of weapons." *VonWillie*, 59 F.3d at 929.

Specifically, he testified that in his experience with the Drug Enforcement Bureau, (1) it was common for drug traffickers to possess and use weapons in order to protect their drugs and to intimidate buyers; (2) the MK-11, one of the guns found in VonWillie's bedroom, was a particularly intimidating gun and he knew of drug dealers who used that specific weapon; and (3) drug traffickers commonly kept a weapon near their drugs.

*Id.* The court concluded that "[t]hese observations are common enough and require such a limited amount of expertise, if any, that they can, indeed, be deemed lay witness opinion." *Id.*

*Fleishman* and *VonWillie* remain good law, but both are distinguishable from the instant case. First, Lopez's case involved several agents testifying that Lopez's actions "were consistent with those of an experienced narcotics trafficker." In fact, Agent Larsen alone testified more than *seven* times to this effect as to various aspects of Lopez's activity. In *Fleishman* and *VonWillie*, only one agent gave an opinion on very limited issues.

Second, the agents' observations in the instant case are not "common enough" to "require such a limited amount of expertise."

1. Federal Rule of Evidence 701 provides: If a "witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue."

*VonWillie,* 59 F.3d at 929. Here, the agents testified that the following behaviors were consistent with an *experienced* drug trafficker: 1) countersurveillance driving; 2) use of code words to refer to drug quantities and prices; 3) use of a third-person lookout when attending a narcotics meeting; 4) use of a rental car to make the drug delivery; 5) hiding the cocaine in the door panels of a car; and 6) dealing in large amounts of very pure cocaine. These "observations" require demonstrable expertise; in fact, several times, the Government instructed the witness to answer questions "based upon your training and experience." Additionally, one agent testified that his familiarity with the fact that narcotics traffickers sometimes speak in code is based upon the training that he had at the DEA Academy.

However, part of the testimony in this case does provide us with a clear example of when a witness may give his lay opinion as to the implications of his observations. INS Special Agent Rapp testified that the movements of the Monte Carlo were "suspicious." Under *VonWillie* and *Fleishman,* such testimony related to matters "common enough" to qualify as lay opinion testimony.

The Government's argument simply blurs the distinction between Federal Rules of Evidence 701 and 702. Lay witness testimony is governed by Rule 701, which limits opinions to those "rationally based on the perception of the witness." Rule 702, on the other hand, governs admission of *expert* opinion testimony concerning "*specialized* knowledge." The testimony in this case is precisely the type of "specialized knowledge" governed by Rule 702. A holding to the contrary would encourage the Government to offer all kinds of specialized opinions without pausing first properly to establish the required qualifications of their witnesses. The mere percipience of a witness to the facts on which he wishes to tender an opinion does not trump Rule 702. Otherwise, a layperson witnessing the removal of a bullet from a heart during an autopsy could opine as to the cause of the decedent's death. Surely a civilian bystand-

er, or for that matter a raw DEA recruit would not be allowed to interpret for the jury Lopez's behavior in the parking lot on May 25, 1995 as that of an "experienced" trafficker merely because that person was an eyewitness to the same.

In addition, the Government's argument subverts the requirements of Federal Rule of Criminal Procedure 16(a)(1)(E). Rule 16 requires the Government to "disclose to the defendant a written summary of [expert] testimony the government intends to use ... during its case in chief." The Rule "is intended to minimize surprise that often results from unexpected testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." Fed.R.Crim.Proc. 16(a)(1)(E) (advisory committee's note).

In sum, rather than testimony "based on the perceptions of the witness"-as the district court described it when overruling Lopez's objections-the bulk of the above opinion testimony is properly characterized as testimony based on the perceptions, education, training, and experience of the witness. It requires precisely the type of "specialized knowledge" of law enforcement governed by Rule 702. Trial courts must ensure that experts are qualified to render their opinions and that the opinions will assist the trier of fact. This careful analysis was absent in this case. *See also Webb,* 115 F.3d at 714 (recognizing that "the expert was particularly qualified" to give his opinion). As judges who have heard such testimony many times, we must not forget that *our* familiarity with it does not bring it within Rule 701, especially given the purpose of Rule 16(a)(1)(E).[2]

### B. *The Error Was Harmless*

■ Finally, the Government contends that even if the opinion testimony was improperly admitted, it was harmless error. We agree.

We acknowledge that the repeated and extensive testimony that Lopez's actions

---

2. Lopez's claim that the disputed opinion testimony amounts to impermissible and prejudicial "trafficker profile evidence," *see United States v.*   *Lim,* 984 F.2d 331 (9th Cir.1993), is unpersuasive.

were "consistent with those of an experienced narcotics trafficker" went to the heart of his entrapment defense. This is not a case where expert opinion testimony was relied on to nail a peripheral player, but a case where the Government had to overcome a defense of entrapment. The Government's burden in this regard was to prove beyond a reasonable doubt that the defendant was predisposed to commit the crime. To do so, the Government relied extensively on the opinion testimony in closing arguments. For example, the Government argued that Lopez's use of code words during his conversations with Storm "shows his experience with narcotics trafficking." Similarly, the Government contended that Lopez's use of countersurveillance, use of a rental car, and method of concealing drugs were indicative of an experienced narcotics trafficker.

Nevertheless, we conclude on this record that the error was harmless, and we do so on the basis of *United States v. Maher*, 645 F.2d 780 (9th Cir.1981). In *Maher*, the district court admitted opinion testimony from DEA agents that Maher's activities were similar to the *modus operandi* of persons conducting countersurveillance while transporting drugs. The trial court ruled that such evidence was admissible "lay opinion" testimony, and it was admitted in evidence without a determination by the court that the witness was qualified pursuant to Rule 104(a) of the Federal Rules of Evidence as an expert. Notwithstanding this lapse, we concluded that any error in *Maher* was harmless because of the "extensive and detailed explanation by one of the DEA agents regarding his experience with surveillance and countersurveillance techniques in narcotics operations." *Id.* at 784. Based on these manifest qualifications, we said, "We think the witness was qualified to give an expert opinion on *modus operandi* in view of his testimony and experience.... Since the testimony was admissible expert opinion, any alleged error by the trial judge in admitting the evidence under the lay opinion rule was harmless." *Id.*

The same holds true here. Agent Larsen testified that he had been a special agent with the Drug Enforcement administration for five years. He had been extensively schooled for 16 weeks at the DEA Academy in Quantico, Virginia in all aspects of his profession, including "the means utilized by drug traffickers to detect certain things, ... and their patterns and other activities." He had over 200 investigations under his belt prior to his testimony in this case which provided him with additional on-the-job training. At any one time, he was working on seven to eight investigations. Given this background, we are certain he was qualified to deliver the opinion testimony disputed in this case, and the failure formally to go through the usual process-although an error-was clearly harmless.

■ As for discovery, a violation of Rule 16 does not itself require reversal, or even exclusion of the affected testimony. *United States v. Basinger*, 60 F.3d 1400, 1407 (9th Cir.1995); *United States v. Baker*, 10 F.3d 1374, 1398 (9th Cir.1993). Figueroa–Lopez must demonstrate prejudice to substantial rights to justify reversal for violations of discovery rules. *Baker*, 10 F.3d at 1398. "The prejudice that must be shown to justify reversal for a discovery violation is a likelihood that the verdict would have been different had the government complied with the discovery rules, not had the evidence suppressed." *Id.* at 1398 n. 8. Figueroa–Lopez has not demonstrated how or why the verdict would have been different if he had been given notice that Agent Larsen planned to testify about his drug trafficking modus operandi.

Finally, the lay opinion testimony of Detective Jones was largely cumulative to that of Agent Larsen. As such, any error with respect to its foundation was also harmless.

## II. The Out–of–Court Statements of Tony Sagoo and His Mother

■ Lopez contends that the out-of-court statements of Sagoo and his mother were improperly admitted for the truth of the matter asserted. The Government contends that the statements were properly admitted as evidence to rebut Lopez's claim of entrapment, not for their truth, but to explain Storm's conduct with respect to Lopez.

In the Government's rebuttal case, informant Storm testified as to his "understanding" of the source of the debt supposedly owed by Sagoo to Lopez. Over Lopez's numerous objections, Storm testified that Sagoo owed Lopez money "from a prior marijuana deal." The district court overruled Lopez's objections and admitted the testimony for "nonhearsay purposes."

On cross-examination, Storm admitted that he had no personal knowledge of Lopez's involvement in the marijuana deal. In fact, all the information Storm learned concerning Lopez's involvement was "from Tony Sagoo."

On appeal, the Government contends that Sagoo's and his mother's statements were not offered for the truth of the matters asserted, but rather "to show their effect on Storm." Whether or not such testimony was relevant or admissible as nonhearsay, we recognize that the prejudicial aspect of this testimony is clear, even if it might be outweighed by its probative value. The district court erred in not containing the force of this evidence with a limiting instruction. Nevertheless, given the wealth of evidence against Lopez and his obvious experienced behavior in this patently commercial transaction, we conclude that the failure to give such an instruction was harmless.

### III.  Entrapment as a Matter of Law

■ Lopez contends he was entrapped as a matter of law. We review this issue de novo, *United States v. Davis*, 36 F.3d 1424, 1430 (9th Cir.1994), *cert. denied*, 513 U.S. 1171, 115 S.Ct. 1147, 130 L.Ed.2d 1106 (1995), and we reject Lopez's contention.

■ There are two elements to the defense of entrapment: (1) government inducement of the crime, and (2) the absence of predisposition on the part of the defendant. *Id.* "Where the government has induced an individual to break the law and the defense of entrapment is at issue, the prosecution must prove beyond a reasonable doubt that the defendant was predisposed to commit the crime prior to first being approached by government agents." *Id.*

Generally, "the issue of whether a defendant has been entrapped is for the jury as part of its function of determining the guilt or innocence of the accused." *Sherman v. United States*, 356 U.S. 369, 377, 78 S.Ct. 819, 822, 2 L.Ed.2d 848 (1958). "It is inappropriate for an appellate court to determine whether a defendant was entrapped when such a determination would necessarily entail 'choosing between conflicting witnesses' and 'judging credibility.'" *Davis*, 36 F.3d at 1430 (quoting *Sherman*, 356 U.S. at 373, 78 S.Ct. at 821).

■ Lopez's entrapment claim rests primarily on his own highly suspect and questionable explanation of the facts, an explanation directly contradicted by the Government's strong evidence. "[T]he resolution of such conflicting assertions of fact relevant to the entrapment issue is a credibility question for the jury." *United States v. Griffin*, 434 F.2d 978, 981 (9th Cir.1970). This factual dispute therefore precludes us from determining as a matter of law that the Government entrapped Lopez.

### IV.  Sentencing Issues

At sentencing, Lopez received a two-level increase for obstruction of justice based on perjury. The district court concluded also that he did not qualify for the "safety value" provision, see Sentencing Guidelines § 2D1.1(b)(4), which could have mitigated his sentence. Finally, the district court declined to award Lopez a downward adjustment for acceptance of responsibility, finding that he "has unequivocally refused to accept blame for his criminal behavior...." We have examined each of these decisions made by the district court and conclude that they are well supported and legally appropriate. Thus, we reject Lopez's challenges to the manner in which he was sentenced.

### CONCLUSION

Although Lopez's trial was not free of error, we affirm his conviction and sentence.

AFFIRMED.