2004 UT App 226

**STATE of Utah, Plaintiff and Appellee,**

v.

**Thomas Kevin ROTHLISBERGER, Defendant and Appellant.**

No. 20030494–CA.

Court of Appeals of Utah.

July 1, 2004.

Barton J. Warren, Salt Lake City, for Appellant.

Mark L. Shurtleff, Atty. Gen., and Brett J. Delporto, Asst. Atty. Gen., Salt Lake City, for Appellee.

Before BENCH, Associate P.J., JACKSON and ORME, JJ.

## OPINION

JACKSON, Judge:

¶ 1 Thomas Kevin Rothlisberger was convicted of one count of Possession of a Controlled Substance with Intent to Distribute and one count of Possession of Drug Paraphernalia. Rothlisberger now argues that the trial court erred in admitting the testimony of Monticello Police Chief Kent Adair (Chief Adair) as lay witness testimony, and that the State therefore erred by failing to provide thirty days notice of that testimony as required by Utah Code Annotated section 77–17–13 (2003). We affirm in part and reverse in part.

## BACKGROUND

¶ 2 On September 24, 2002, Tonya Althoff and Rothlisberger were pulled over while returning to Utah after a brief trip to Arizona. Officer Jim Eberling (Officer Eberling) initially pulled the pair over after observing an improper lane change. At the time of the stop, Althoff was driving the car and Rothlisberger was sitting in the front passenger seat. A subsequent search of police records by Officer Eberling revealed that the license plates on the car had expired and that Althoff's driver license had been suspended. Because of this, Althoff was removed from the vehicle and placed under arrest.

¶ 3 After Althoff had been handcuffed and placed in Officer Eberling's car, Officer Eberling conducted a search of the vehicle. During this search, Officer Eberling discovered a small plastic bag containing methamphetamine that was located in plain view on the console between the two front seats. Sometime during this initial phase of the

search, Chief Adair arrived on the scene. Due to the discovery of the small plastic bag containing methamphetamine on the front console, the officers placed Rothlisberger under arrest and continued with their search of the car. During this search, Chief Adair noticed that Rothlisberger had acted very nervous while Officer Eberling was searching in the area of the front passenger seat. Based on Rothlisberger's behavior, Chief Adair instructed Officer Eberling to focus on the passenger side of the car. Further search led to the discovery of a pair of men's pants that had been stuffed into the passenger's side door panel. Inside of the pants was a small plastic bag, placed inside of a toilet paper roll, that contained what was later shown to be thirty-two grams of methamphetamine. The officers also found a snort tube with the pair of pants. The snort tube was covered with a white residue that was later identified as methamphetamine. During the further search of the vehicle, the officers also found a gym bag in the trunk that contained drug scales, covered in white residue, and several small plastic bags.

¶ 4 After being given the Miranda warnings, Rothlisberger admitted to officers that the pants found stuffed in the passenger side door were his. Rothlisberger also admitted that the snort tube was his. Rothlisberger further admitted to having used methamphetamine before leaving Arizona earlier that morning. After being given the Miranda warnings, Althoff claimed that the gym bag found in the trunk was hers. She also claimed that the methamphetamine found in the car was hers, and that Rothlisberger had no knowledge of it.

¶ 5 On September 26, 2002, Rothlisberger was charged with one count of Possession of a Controlled Substance with Intent to Distribute, in violation of Utah Code Annotated section 58–37–8(1)(a)(iii) (2003), and one count of Possession of Drug Paraphernalia, in violation of Utah Code Annotated section 58–37a–5(1) (2003).[1] On December 2, 2002, Rothlisberger appeared before the district court for his preliminary hearing. At the preliminary hearing, Officer Eberling testified regarding the significance of the quantity of drugs found in Rothlisberger's pair of pants. Officer Eberling specifically testified that the drugs found in the pants were of such large quantity that it was likely that the drugs were intended for further sale. Though Chief Adair also testified at the preliminary hearing regarding his participation in the arrest, he did not offer any testimony at the preliminary hearing regarding the significance of the quantity of methamphetamine found in Rothlisberger's pants.

¶ 6 At trial, however, the prosecutor did not ask Officer Eberling to offer his opinion regarding the significance of the quantity of methamphetamine found in Rothlisberger's pants. Instead, questions regarding the significance of the quantity were now directed toward Chief Adair. The following colloquies occurred during Chief Adair's direct examination:

Q: Chief Adair, have you had an occasion in your experience to look or see how methamphetamine is usually packaged as far as—when you have found methamphetamine in your experience, have you found times when people have had personal use amounts?

A: Yes.

Q: How is it usually packaged or what is the quantity?

A: A quarter or half grams, right in there. Maybe even at the most a gram.

. . . .

Q: Do you have—through your training and experience, do you know commonly what somebody would buy if they were to go out on the street buy some right now, what would they usually get for personal use?

A: I don't understand the question. What do you mean what would they usually get?

Q: Well, if I—

A: Are you talking the quantity?

Q: Yes.

---

1. Althoff was also charged with various criminal counts arising out of this same incident. Her subsequent trial and convictions, however, are not before us as part of this appeal.

A: In our undercover investigations when we buy from individuals, we usually buy a quarter or a half a gram.

. . . .

Q: Have you ever found in your experience that someone who had personal quantities of methamphetamine to have scales?

A: It's not common, no.

¶ 7 Defense attorneys objected to Chief Adair's testimony, arguing that it should be deemed expert testimony under rule 702 of the Utah Rules of Evidence and accordingly that admission of that expert testimony was improper because the State had not given the defense thirty-days notice of the expert testimony as required by Utah Code Annotated section 77–17–13 (2003). The trial court overruled this objection, ruling that Chief Adair's testimony was admissible as lay witness testimony under rule 701 of the Utah Rules of Evidence.

¶ 8 On February 11, 2003, Rothlisberger was found guilty on both counts. He now appeals.

### ISSUE AND STANDARD OF REVIEW

¶ 9 Rothlisberger argues that the trial court erred in admitting Chief Adair's testimony regarding the significance of the quantity of methamphetamine found in Rothlisberger's pants. We review decisions relating to the qualification of a witness as an expert or as a lay witness for an abuse of discretion. *See Hardy v. Hardy,* 776 P.2d 917, 925 (Utah Ct.App.1989).[2]

### ANALYSIS

■ ¶ 10 Under Utah Code Annotated section 77–17–13(1)(a) (2003), "[i]f the prosecution or the defense intends to call any expert to testify in a felony case at trial . . . the party intending to call the expert shall give notice to the opposing party as soon as practicable but not less than 30 days before trial." Rothlisberger argues that Chief Adair's testimony regarding the significance of the amount of methamphetamine found with his pants was expert testimony, and that the State's failure to give him thirty-days notice of that testimony warrants reversal. We agree.

¶ 11 Under the Utah Rules of Evidence, lay witness testimony is defined as testimony that is "rationally based on the perception of the witness," Utah R. Evid. 701, while expert testimony is testimony that is based on "scientific, technical, or other specialized knowledge." Utah R. Evid. 702. There have been multiple Utah cases that have discussed the question of whether a witness may be classified as an expert for the purposes of testifying about a particular subject. *See, e.g., Smith v. Grand Canyon Expeditions Co.,* 2003 UT 57,¶ 25, 84 P.3d 1154; *Alder v. Bayer Corp.,* 2002 UT 115,¶¶ 52–86, 61 P.3d 1068. The question before us today, however, is not whether the State *could* have offered expert testimony regarding this subject, but rather whether that subject is so specialized that the State *must* first qualify its witness as an expert before the trial court can properly admit testimonial opinion regarding it.

¶ 12 The State contends that this subject was resolved by the opinion of our supreme court in *State v. Ellis,* 748 P.2d 188 (Utah 1987). In *Ellis,* one of the issues before the court was whether a lay witness could be allowed to offer his opinion that two separate footprints that were found at the scene of a crime came from the same shoe. *See id.* at 190. In ruling that such testimony was admissible as lay witness testimony, our supreme court held that

> [s]imply because a question might be capable of scientific determination, helpful lay testimony touching on the issue and based on personal observation does not become expert opinion. It is true that "if [a question] is capable of scientific determination, then expert testimony is admissible with respect to it"; however, that *does not* mean that lay opinion testimony is prohibited if the provisions of the evidentiary rule are met.

**2.** Rothlisberger also argues that the State's pretrial failure to notify him of Chief Adair's potential testimony violated rule 16 of the Utah Rules of Criminal Procedure. Because we hold that reversal is warranted due to the State's failure to comply with Utah Code Annotated section 77–17–13 (2003), we need not reach the merits of this separate claim.

*Id.* at 191 (citation omitted) (alterations in original).

¶ 13 Contrary to the State's assertions, we do not think that *Ellis* is directly controlling here. In affirming the trial court's conclusion that the challenged testimony was lay testimony, the *Ellis* court simply concluded that though the subject of footprint comparison *might* be a subject about which experts *could* testify, the challenged testimony itself did not automatically meet the definitional standards for expert testimony. Left unresolved in *Ellis,* however, was the question of whether there are certain other subjects that should be considered so intrinsically specialized that a witness could not testify regarding them without relying on the types of "scientific, technical, or other specialized knowledge" that are characteristic of expert testimony under rule 702.[3]

¶ 14 To date, there has been no Utah decision that has directly addressed the question of whether a witness *must* be characterized as an expert in order to testify about a particular subject. In circumstances in which Utah courts have not definitively addressed an issue, it is appropriate for us to turn to decisions and commentators that interpret the related federal rules for guidance. *See State v. Gomez,* 2002 UT 120, ¶ 33 n. 5, 63 P.3d 72.

¶ 15 Our review of the related federal cases indicates that the question of whether a person must be designated as an expert to testify regarding a particular subject is one that has been the subject of much disagreement among the federal courts. Some courts have taken a narrow interpretive approach to this question, holding that a witness whose testimony *could* be admitted as expert testimony under rule 702 *must* be admitted as an expert in order to testify regarding that subject. In *Randolph v. Collectramatic, Inc.,* 590 F.2d 844 (10th Cir. 1979), for example, the Tenth Circuit held that a lay witness is not permitted to "express an opinion as to matters which are beyond the realm of common experience and which require the special skill and knowledge of an expert witness." *Id.* at 846. This bright line rule was similarly emphasized by the Fourth Circuit in *Certain Underwriters at Lloyd's, London v. Sinkovich,* 232 F.3d 200 (4th Cir.2000), wherein the court held that rule 701 does not permit lay witnesses to testify about matters that are necessarily predicated on "some specialized knowledge or skill or education that is not in the possession of the jurors." *Id.* at 203 (quotations and citation omitted). In this manner, courts that have adopted this narrow interpretive approach have essentially concluded that the definitional boundary separating rule 701 lay testimony from rule 702 expert testimony should be carefully observed. In essence, courts following this approach hold that while lay witnesses are allowed to testify regarding their direct perceptions of the events in question, opinions or inferences that are reliant on "scientific, technical, or other specialized knowledge" are necessarily excluded unless the witness is first qualified as an expert.

¶ 16 Other federal courts have favored a more liberal interpretive approach to the question at hand. The Fifth Circuit, for example, has clearly held that lay witness testimony may include opinions that are predicated on "specialized knowledge," as long as that testimony is rationally based on the "personal perception" of the witness. *United States v. Riddle,* 103 F.3d 423, 428 (5th Cir.1997). Thus, in *Soden v. Freightliner Corp.,* 714 F.2d 498 (5th Cir.1983), the court held that a mechanic was allowed to testify as a lay witness regarding his conclusion that a particular design defect was not only dangerous, but also the likely cause of a series of accidents. *See id.* at 510–12. In holding that the testimony was admissible as lay witness testimony, the court emphasized that the mechanic's testimony was based on his own personal observations of the involved trucks, *see id.* at 511–12, and that the opinions that he offered were "rationally" related

---

3. It is worth noting that under *Ellis's* express terms the State would not have been prevented from calling an expert witness in footprint identification to further bolster its case before the jury, nor would the State have been prevented from attempting to bolster that very witness's own credibility by attempting to qualify him as an expert in footprint identification or forensic investigation.

to those personal observations. *Id.* at 512. The court thus emphasized that though the witness's testimony "did constitute an opinion which might have better been given by one more formally an expert," its "strong basis both in his observation and in his experience" rendered it a subject about which lay testimony could appropriately be offered. *Id.*

¶ 17 Various other federal courts have followed this more liberal interpretive approach. For example, the Eighth Circuit held that "four executives of railroads" were allowed to testify "that, in their experience, trains with cabooses were no safer than cabooseless trains." *Burlington N. R.R. Co. v. Nebraska,* 802 F.2d 994, 1004 (8th Cir.1986). According to the *Burlington N. R.R. Co.* court, this testimony was appropriately characterized as lay witness testimony because it was based on the executives' own "personal experiences." *Id.* Similar results were reached in such cases as *United States v. Sweeney,* 688 F.2d 1131, 1145 (7th Cir.1982), and *United States v. VonWillie,* 59 F.3d 922, 929 (9th Cir.1995).

¶ 18 The more liberal interpretive approach has, however, been the subject of some criticism. One respected commentator has written that "many courts expanded the admissibility of lay opinion and inference testimony beyond Rule 701's primary purpose, thereby permitting lay opinion testimony to encroach on Rule 702's province." 4 Joseph M. McLaughlin et al., Weinstein's Federal Evidence § 701.03[4][b] (2d ed.2004). This same commentator further wrote that "[i]n some instances, it has been difficult to discern from the court's opinions why the admissible 'lay opinion testimony' was not, in fact, 'expert opinion testimony.' " *Id.* Certain federal courts have been similarly critical of the liberal approach. The Eleventh Circuit, for example, has recently noted that the liberal approach would potentially allow parties to evade the strictures of the expert qualification process by simply characterizing their expert witnesses as lay witnesses. *See Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co.,* 320 F.3d 1213, 1222 (11th Cir. 2003).

¶ 19 These concerns appear to have been shared by the drafters of the federal rules.

Indeed, the 2000 amendment to rule 701 of the Federal Rules of Evidence appears to have been expressly drafted for the purpose of closing this erstwhile loophole. Before the amendment, rules 701 and 702 of the Federal Rules of Evidence were silent on the issue of whether lay witnesses were allowed to offer opinions on certain subjects that would normally require specialized knowledge. The 2000 amendment to rule 701 changed this, however, with the rule now expressly declaring that lay witnesses are not allowed to offer testimony that is "based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Explaining the purpose of this amendment, the advisory committee notes to rule 701 of the Federal Rules of Evidence expressly state that "[r]ule 701 has been amended to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing." The advisory committee notes further state that

> [t]he amendment does not distinguish between expert and lay witnesses, but rather between expert and lay testimony. Certainly it is possible for the same witness to provide both lay and expert testimony in a single case. The amendment makes clear that any part of a witness'[s] testimony that is based upon scientific technical, or other specialized knowledge within the scope of Rule 702 is governed by the standards of Rule 702 and the corresponding disclosure requirements of the Civil and Criminal Rules.

*Id.* (emphasis added).

▬ ¶ 20 After considering the different approaches to this question, we are persuaded that the narrow interpretive approach embodied by the 2000 amendment to rule 701 of the Federal Rules of Evidence is the correct approach to follow in interpreting our own rules of evidence. When confronted with questions of rule-based or statutory interpretation, we endeavor to interpret the rules and statutes in such a manner so as to give full meaning and effect to all of the involved provisions. Here, adopting the open-ended approach discussed above would not only blur the distinction between rules 701 and

702 of the Utah Rules of Evidence, but would also create the very real danger that parties might impermissibly seek to avoid the reliability and reporting requirements required under our law by merely engaging in games of semantics. To avoid opening the door for such results, we think it clear that when a witness seeks to testify regarding matters that are necessarily based on that witness's "scientific, technical, or specialized knowledge," that witness must be qualified as an expert under rule 702 of the Utah Rules of Evidence, and all reliability, reporting, or otherwise applicable statutory commands must then be followed with respect to that testimony.[4]

¶ 21 The Ninth Circuit's opinion in *United States v. Figueroa–Lopez*, 125 F.3d 1241 (9th Cir.1997), is instructive. In *Figueroa–Lopez*, the defendant was charged with various counts relating to an illegal drug transaction. *See id.* at 1242. At trial, various federal agents who were involved in the surveillance of the defendant testified regarding the events leading up to the arrest. *See id.* One agent, testifying as a lay witness, asserted that the defendant had engaged in "countersurveillance" activities that were "common practice for narcotics dealers" and that the defendant's use of a rental car was also "a common practice for narcotics dealers." *Id.* at 1243. On appeal, the Ninth Circuit overruled the trial court's conclusions that the testimony was properly admissible as lay witness testimony. *See id.* at 1246. In so ruling, the appellate court found that the testimony was necessarily predicated on "demonstrable expertise" in the area of law enforcement, *id.*, and that the subjects about which the agent testified were therefore not "common enough" to be the subject of lay witness testimony. *Id.* at 1245. Responding to the government's argument that the testimony was admissible as lay witness testimo-

ny due to its reliance on the agent's own personal observations, the court noted that the government's argument would "simply blur[ ] the distinction between Federal Rules of Evidence 701 and 702.... A holding to the contrary would simply encourage the Government to offer all kinds of specialized opinions without pausing first properly to establish the required qualifications of their witnesses." *Id.* at 1246.

¶ 22 Importantly, the *Figueroa–Lopez* court then identified portions of another agent's testimony that were properly admissible as lay witness testimony. Noting that one of the agents had testified regarding the "suspicious" nature of the defendant's conduct, the court expressly held that opinions regarding whether a person is acting suspiciously are "common enough" to be admissible as lay witness testimony. *Id.* at 1246. The decision in *Figueroa–Lopez* therefore provides an example of how the rules do "not distinguish between expert and lay witnesses, but rather between expert and lay testimony." Fed R. Evid. 701 advisory committee notes. Thus, it is "[c]ertainly ... possible for the same witness to provide both lay and expert testimony in a single case." *Id.*

¶ 23 The question before us in the present case, then, is whether Chief Adair's testimony regarding the significance of the quantity of methamphetamine found in Rothlisberger's pants was the type of testimony that was necessarily based on scientific, technical, or other specialized knowledge. We hold that it was.

¶ 24 It is well settled that witnesses can be qualified as experts not only on the basis of formal educational training, but also on the basis of their own personal or vocational experiences. *See, e.g., State v. Kelley*, 2000 UT 41,¶ 15, 1 P.3d 546; *Randle v. Allen*,

---

4. In *State v. Gordon*, 913 P.2d 350 (Utah 1996), our supreme court noted that "when a new rule ... constitutes a clear break with the past, it is not generally applied retroactively." *Id.* at 354. This is particularly so where a retroactive application would impair our efforts to "maintain[ ] the efficient administration of justice." *Id.*

We recognize here that our interpretation of rules 701 and 702 of the Utah Rules of Evidence settles a question for which there had been little

prior guidance from Utah appellate courts. We further recognize that this issue is likely the subject of some dispute in many cases that are currently before our various courts. In order to maintain the efficient administration of justice, we accordingly hold that today's opinion should only be applied prospectively, and that any decisions relating to this question that were entered prior to today's holding should not be reversed thereby.

862 P.2d 1329, 1337 (Utah 1993). In *State v. Espinoza*, 723 P.2d 420 (Utah 1986), for example, our supreme court held that a witness's prior experience as a "user and seller" of drugs qualified him to testify as an expert on "the current drug culture." *Id.* at 420. Similarly, in *Randle*, our supreme court held that a witness could be qualified as an expert in accident reconstruction by virtue of his practical experience dealing with such matters. *See Randle*, 862 P.2d at 1337.

¶ 25 There have been no Utah cases that have specifically addressed the question of whether knowledge of the significance of a particular quantity of an illegal drug should be regarded as specialized knowledge about which a witness must be qualified as an expert in order to testify. The Tenth Circuit, however, has specifically addressed this question and has definitively concluded that such knowledge should be regarded as specialized knowledge. In *United States v. McDonald*, 933 F.2d 1519 (10th Cir.1991), the court noted that the "[d]efendant possessed 6.7 grams of rock cocaine." *Id.* at 1522. The court then concluded that "[a] person possessing no knowledge of the drug world would find the importance of this fact impossible to understand. The average juror would not know whether this quantity is a mere trace, or sufficient to pollute 1000 people." *Id.* In *United States v. Muldrow*, 19

F.3d 1332 (10th Cir.1994), the court similarly held that "a veteran police officer" testified from "specialized knowledge" when he testified that a particular amount of cocaine would likely be "for distribution and not for personal use." *Id.* at 1338.

▬ ¶ 26 We agree with the Tenth Circuit's assessment of this question. In our view, knowledge regarding the significance of a particular quantity of drug is "beyond the realm of common experience" for the common juror, *Randolph*, 590 F.2d at 846, and is accordingly the type of testimony that a witness could offer only if first qualified as an expert.[5] Applied to the present case, Chief Adair was clearly permitted to offer lay witness testimony regarding the events leading up to Rothlisberger's arrest. Chief Adair was further permitted to offer testimony that was rationally derived from his perceptions of the events on that day. Such testimony could also have included any opinions relating to any matters arising therefrom that would have been within the common experience of a common citizen. The State was not permitted, however, to elicit any opinions or conclusions from Chief Adair that were necessarily based on scientific, technical, or other specialized knowledge, without first seeking to qualify him as an expert witness under

---

5. The State argues that, under the terms of our decision in *Provo City Corp. v. Spotts*, 861 P.2d 437 (Utah Ct.App.1993), we should reach a different result on this question. In *Spotts*, we held that a lay witness was permitted to testify regarding the identity of a particular drug. *See id.* at 442–43. In reaching that conclusion, we "emphasize[d] that [the] case involved not only the substance's smell, but also simultaneous observation of the smoke exiting defendant's mouth and prior observation of the act of taking 'hits' from a 'joint.' " *Id.* at 443. In our view, the result in *Spotts* was necessarily predicated on our recognition of the degree to which certain drugs have permeated our society. Because of this proliferation, knowledge of the appearance, smell, and resultant physical effects of certain substances can unfortunately be considered common knowledge in our society. Our decision in *Spotts* implicitly acknowledged this sad state of affairs, and thus appropriately held that opinions regarding the identity of particular substances can be the subject of lay testimony. The question before us here, however, does not deal with the common juror's ability to merely identify a particular substance, but instead deals with the common

juror's ability to identify whether a particular quantity of an illegal substance is so large that it would likely be used for future sale. By definition, the only persons having such knowledge would be those who are either actually involved in the sale of illegal substances, or those who are involved in law enforcement's efforts to curb such sales. Either way, this knowledge must be regarded as specialized, and testimony that is based on that knowledge would therefore appropriately be characterized as expert testimony.

Notably, a similar result was emphasized by the federal rules advisory committee. As noted in the advisory committee notes to Federal Rule of Evidence 701, testimony

> that a substance appeared to be a narcotic .... is not based on specialized knowledge within the scope of Rule 702, but rather is based upon a layperson's personal knowledge. If, however, that witness were to describe how a narcotic was manufactured, or to describe the intricate workings of a narcotic distribution network, then the witness would have to qualify as an expert under Rule 702.

Fed.R.Evid. 701 advisory committee's note.

rule 702 of the Utah Rules of Evidence. The testimony from Chief Adair based on his specialized knowledge was therefore permissible only upon compliance with all applicable laws and rules relating to expert testimony. Because the trial court allowed Chief Adair to testify as a lay witness regarding these matters, we thus necessarily conclude that the court abused its discretion.[6]

¶ 27 Having concluded that the trial court abused its discretion in characterizing Chief Adair's testimony as lay witness testimony, we can readily conclude that the State was required to comply with the notice requirements for expert witnesses contained in Utah Code Annotated section 77–17–13 (2003). Under section 77–17–13(1)(a), the State was required to provide Rothlisberger with thirty-days notice that it intended to offer Chief Adair as an expert witness; section 77–17–13(1)(b) specifically requires that notice to include

> the name and address of [Chief Adair], [Chief Adair]'s curriculum vitae, and one of the following:
>
> (i) a copy of [Chief Adair]'s report, if one exists; or

(ii) a written explanation of [Chief Adair]'s proposed testimony sufficient to give the opposing party adequate notice to prepare to meet the testimony; and

(iii) a notice that the expert is available to cooperatively consult with the opposing party on reasonable notice.

¶ 28 The State argues that, even if we conclude that Chief Adair's testimony constituted expert testimony, compliance with section 77–17–13 was still not required for two reasons. First, the State argues that Rothlisberger's failure to request a continuance acted as a waiver of his right to notice. Second, the State argues that Rothlisberger was given notice of the proposed testimony by virtue of the similar testimony that was offered by Officer Eberling at the preliminary hearing. We disagree.

¶ 29 It is generally true that, when a party is confronted with surprise expert testimony at trial, a failure to request a continuance acts as a waiver of the right to challenge the admission of that testimony. *See State v. Perez*, 2002 UT App 211, ¶ 37, 52 P.3d 451 ("When the prosecution introduces unexpected testimony, a defendant 'essential-

---

**6.** After the conclusion of the trial, the trial court was asked to reconsider its prior ruling regarding the nature of Chief Adair's testimony. In this post-trial ruling, the court held that Chief Adair's testimony "actually turned out to be neither expert testimony or lay opinion testimony, but merely testimony about Adair's actual experiences." In support of that conclusion, the court noted that Chief Adair had not actually offered a direct opinion as to whether the quantity of methamphetamine that was found in Rothlisberger's pants was a saleable quantity, but that Chief Adair had instead simply testified in general terms regarding the significance of such quantities in his past experiences. The State thus argues that we should alternatively affirm the rulings below on the basis of this post-trial ruling. We disagree.

The trial court may have been technically correct in noting that Chief Adair did not offer a direct opinion as to whether Rothlisberger had the intent to distribute illegal drugs. As noted by the trial court, it does appear that the questions relating to the significance of various quantities of illegal drugs were framed with reference to Chief Adair's past experiences, and that Chief Adair was never directly asked how the quantity of methamphetamine that was found in Rothlisberger's possession comported with those prior experiences. The State's failure to elicit such

direct, case-specific opinion testimony does not mean, however, that Chief Adair's testimony should not still be regarded as expert testimony. Rule 702 of the Utah Rules of Evidence specifically states that an expert who testified "by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion *or otherwise*." (Emphasis added.) Under its express terms, the rule therefore contemplates that non-opinion testimony can still be qualified as expert testimony if it is based on specialized knowledge or experience. One example of non-opinion expert testimony is then specifically referred to in rule 703 of the Utah Rules of Evidence, which states that expert testimony may be admitted in the form of "an opinion or inference." We think it plain that, in the present circumstances, Chief Adair's testimony was certainly intended to create the inference that the thirty-two grams of methamphetamine found in Rothlisberger's pants were of such a large quantity that an intent to distribute could be inferred. *Cf. State v. Fox*, 709 P.2d 316, 320 (Utah 1985) (noting that the quantity of an illegal substance can be used as evidence of an intent to distribute); *State v. Anderton*, 668 P.2d 1258, 1262 (Utah 1983) (same). As such, the trial court erred in its conclusion that Chief Adair's failure to offer a direct opinion as to the meaning of this particular evidence rendered his testimony admissible as non-expert testimony.

ly waives his right to later claim error' if the defendant fails to request a continuance or seek other appropriate relief under Rule 16(g) [of the Utah Rules of Criminal Procedure]." (Quoting *State v. Rugebregt,* 965 P.2d 518, 522 (Utah Ct.App.1998) (quoting *State v. Larson,* 775 P.2d 415, 418 (Utah 1989)).)). In contrast to the waiver cases cited by the State, however, the situation before us is not one in which the defendant failed to request a continuance upon being presented with surprise expert testimony. Rather, this is a situation in which, after receiving the appropriate objection from the defendant, the trial court expressly determined that the challenged testimony was *not* expert testimony, but that it was instead admissible as lay witness testimony. As discussed above, we have determined that that ruling was in error. As a result of the trial court's ruling, however, the mandatory continuance provisions of section 77–17–13(4)(a) would have necessarily been deemed inapplicable, insofar as there was no court-recognized expert testimony being offered. In essence, the trial court's ruling that the testimony was lay witness testimony rendered any objection that was predicated on expert-testimony rules futile. Under our law, parties are not required to make futile objections in order to preserve a future claim. *See Orem City v. Bovo,* 2003 UT App 286, ¶¶ 13, 16, 76 P.3d 1170. Thus, because the trial court first erred by concluding that the challenged testimony was admissible as lay witness testimony, we cannot say that Rothlisberger waived his right to challenge the admission of that testimony by then failing to request a continuance under section 77–17–13(4)(a).

■ ¶ 30 Next, section 77–17–13(5)(a) provides that "testimony of an expert at a preliminary hearing ... constitutes notice of the expert, the expert's qualifications, and a report of the expert's proposed trial testimony as to the subject matter testified to by the expert at the preliminary hearing." We disagree with the State's suggestion, however,

that the testimony of Officer Eberling at the preliminary hearing provided Rothlisberger with notice of the similar testimony that was ultimately offered by Chief Adair at trial. Under the terms of section 77–17–13(1)(b), a party who is seeking to offer expert testimony must first provide the other party with a copy of the expert's name, address, and curriculum vitae. This clearly contemplates that the opposing party will have the opportunity to prepare for that expert's testimony in a witness-specific fashion. *See Turner v. Nelson,* 872 P.2d 1021, 1023 (Utah 1994) (holding that one of the "significant purposes" of pretrial witness disclosure rules is to provide the opposing party with the opportunity to "investigat[e] the witness['s] testimony" and "prepar[e] an effective cross-examination"). In *State v. Tolano,* 2001 UT App 37, 19 P.3d 400, we held that the notice provision of section 77–17–13(5)(a) is only satisfied where a witness personally testifies at the preliminary hearing; otherwise, the opposing party would not have the time to "prepare to meet [the] adverse expert testimony." *Id.* at ¶ 18 (quotations and citation omitted).

■ ¶ 31 Here, Officer Eberling's testimony at the preliminary hearing did not provide Rothlisberger with the proper opportunity to prepare for Chief Adair's expert testimony. Though the testimonies of the two officers might ultimately have been similar in content, it is nevertheless clear that the State's failure to provide notice of Chief Adair's potential expert testimony at trial deprived Rothlisberger of the notice that he would need to prepare a witness-specific response to that testimony. Thus, because Chief Adair failed to testify as an expert at the preliminary hearing, the State's failure to provide Rothlisberger with notice of his testimony constituted a violation of section 77–17–13(5)(a). Inasmuch as that testimony was central to the Possession with Intent to Distribute charge, we accordingly reverse Rothlisberger's conviction.[7]

---

7. Rothlisberger also argues (i) that the trial court erred in denying his motion for a directed verdict; (ii) that the trial court erred in overruling his objection to various statements made by the prosecutor in his closing statement; and (iii) that

the trial court erred by failing to instruct the jury on the alternate reasonable hypotheses of innocence. Because we have already determined that a new trial is warranted with respect to Rothlisberger's conviction for Possession of a

## CONCLUSION

¶ 32 We conclude that the trial court abused its discretion when it allowed Chief Adair to testify as a lay witness about the significance of various quantities of methamphetamine. Because the State failed to give Rothlisberger thirty-days notice of that testimony as required by Utah Code Annotated section 77–17–13 (2003), we reverse Rothlisberger's conviction for Possession with Intent to Distribute and remand for a new trial on that charge.

¶ 33 I CONCUR: GREGORY K. ORME, Judge.

¶ 34 I DISSENT: RUSSELL W. BENCH, Associate Presiding Judge.

Controlled Substance with Intent to Distribute, we need not address these arguments with respect to that charge.

With respect to Rothlisberger's arguments relating to his conviction for Possession of Drug Paraphernalia, we conclude that reversal is not warranted. As noted above, Rothlisberger admitted to the officers that the snort tube that was found in the car was his. Rothlisberger has not contested the admissibility of that admission before this court, nor has he argued that the snort tube does not constitute drug paraphernalia under Utah Code Annotated section 58–37a–3 (2002). As such, we can readily conclude that the court did not err in denying his motion for a directed verdict on that charge. We can further conclude that any error that the court might have made with respect to the rulings regarding either the prosecutor's closing statements or the alternate reasonable hypothesis of innocence doctrine was harmless. Accordingly, Rothlisberger's conviction for Possession of Drug Paraphernalia is affirmed.