2022 UT App 9

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
DOUGLAS JACK CARTER, JR.,
Appellant.

Opinion
No. 20190708-CA
Filed January 21, 2022

Fifth District Court, Cedar City Department
The Honorable Matthew L. Bell
No. 181500817

Emily Adams, Freyja Johnson, and Cherise Bacalski,
Attorneys for Appellant

Sean D. Reyes and Thomas Brunker,
Attorneys for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGE RYAN D. TENNEY concurred, with opinion. JUDGE DIANA
HAGEN dissented, with opinion.

ORME, Judge:

¶1    Douglas Jack Carter, Jr., appeals his conviction for aggravated arson. He asserts that his trial counsel provided ineffective assistance by not objecting to certain testimony of the State's expert witness and by not moving for a directed verdict. We affirm.

BACKGROUND[1]

¶2    On a Monday in October 2018, a vacant house in a residential neighborhood caught fire. The fire department successfully extinguished the blaze, and the damage was confined to the area around the utility meter. The fire melted some siding but otherwise did little damage. While responding to the fire, firefighters found it necessary to pull drywall and insulation from the interior walls nearest the meter to check for flames or hot embers. The firefighters then left the house with the drywall and insulation on the floor, and they disconnected all the utilities for safety reasons.

¶3    Just three days later, early on Thursday morning, the house again caught fire. This time, the fire was much more destructive, resulting in the house being declared a total loss and later being demolished. The fire marshal, with the assistance of "an accelerant detection canine," investigated the scene and soon determined that the second fire originated in the same location as the previous fire and that it was intentionally set by igniting gasoline.

¶4    While firefighters worked at the scene, Carter appeared and spoke with responding police officers. His presence seemed odd to the officers because it was very early in the morning, it was cold, and Carter was only wearing "pajamas and a light jacket." The officers began to suspect that Carter, who lived just "two houses to the north of where the fire was located" and who was suspected of burning utility poles in an unrelated case, was involved with the fire. Furthermore, the vacant house was a "family home" that once belonged to Carter's deceased

---

1. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Daniels*, 2002 UT 2, ¶ 2, 40 P.3d 611.

grandmother and was then passed to Carter's mother, who sold it to Carter's cousin due to her inability to pay the taxes and utility bills on the property. Based on these facts, the officers obtained a warrant to search Carter's property. The search revealed an empty box of matches on an armchair in his home and a gas can containing a small amount of gas in a shed. Carter was then arrested. The arresting officers observed a visible burn on his wrist. Carter initially denied starting the second fire but later admitted that he used the gasoline and matches found during the search to start the fire.

¶5 The State charged Carter with aggravated arson under Utah Code section 76-6-103 for the second fire.[2] In relevant part, under that section "[a] person is guilty of aggravated arson if by means of fire or explosives he intentionally and unlawfully damages . . . a habitable structure." Utah Code Ann. § 76-6-103(1) (LexisNexis 2017). A habitable structure is defined as "any building, vehicle, trailer, railway car, aircraft, or watercraft used for lodging or assembling persons or conducting business whether a person is actually present or not." *Id.* § 76-6-101(1)(b).

¶6 At trial, it was undisputed that Carter set the second fire. Thus, the trial turned solely on whether the vacant house qualified as a "habitable structure" under the statute. If it did, then Carter was guilty of aggravated arson, a first-degree felony. *See id.* § 76-6-103(2). If it did not, then Carter was guilty of the lesser included offense of arson, a second-degree felony under the facts of this case. *See id.* § 76-6-102(3).

¶7 Prior to the start of trial, the parties debated how to instruct the jury on the definition of "habitable structure."

---

2. Carter was also charged with two counts of arson for burning utility poles. The jury acquitted Carter of these counts. He was not charged for the first fire at the house.

Carter's trial counsel proposed a jury instruction that stated, "The focus of the definition of 'Habitable Structure' is on the actual use of the particular structure, not on the usual use of similar types of structures." Trial counsel's argument, therefore, was that for a house to be deemed a habitable structure under the statutory definition, it must actively be lived in and cannot be vacant at the time the fire is set. The district court apparently disagreed, stating that "[y]ou don't have to show it's being actually lived in," and the court refused to provide the jury with the proposed instruction.

¶8    On the other hand, the State, relying on an Arizona case, proposed an instruction that "habitable structure includes any dwelling house, whether occupied, unoccupied, or vacant." The district court also rejected this proposed instruction. It reasoned that the Arizona case the State cited was inapplicable because it dealt with an Arizona statutory definition that differed from the Utah statutory definition.

¶9    The court then determined that it would simply instruct the jury with the exact wording of the statutory definition of "habitable structure." *See id.* § 76-6-101(1)(b). The court informed the parties that they could argue to the jury whether that definition meant that the house had to actually be in use at the time the arson took place. The court also indicated that it would instruct the jury that if it found that the house was not a habitable structure, then it could convict Carter of the lesser included offense of arson.

¶10    At trial, the State called, as an expert witness, the fire marshal who investigated the fire.[3] The last question the State asked the fire marshal in its direct examination was whether, "in

---

3. The State called additional witnesses but, except as hereafter noted, their testimony is irrelevant to the issues Carter raises on appeal.

[his] expert opinion," the house was "a habitable structure." The fire marshal responded, "Yes." Carter's trial counsel did not object.

¶11     On cross-examination, the fire marshal explained that while drywall and insulation "had fallen into the structure . . . it was pretty obvious that . . . the home was livable" before the second fire destroyed the house. But trial counsel did elicit testimony from the fire marshal that there was no food or furniture in the house that would indicate that someone had been living there at the time the second fire was started. Trial counsel then asked how the fire marshal was qualified to determine whether the house was a habitable structure. The fire marshal explained that in determining the house was a habitable structure, he relied on "general common sense," his experience in investigating fires over the years and seeing "what people are willing to live in," and the fact that the house had been "built to be a habitable structure." The fire marshal also explained that he had "seen structures that were considerably more damaged than [the house was after the first fire] that people have moved back into."

¶12     Later, during a discussion with the court on another issue, trial counsel explained why he did not object to the fire marshal's testimony that the house was a habitable structure. He explained that he did not object because "all [the fire marshal] says is that somebody could live in it." And as part of the defense strategy, that answer was irrelevant because, in accordance with trial counsel's interpretation of the statute, he was focused on "what was it being used for at that time."

¶13     During its closing argument, the State walked the jury through the elements of aggravated arson. When discussing whether the house was a "habitable structure," the State argued that "[i]t was classified as a habitable structure by Fire Marshal . . . , an expert witness." The State also argued that "[t]he primary purpose of this type of structure is lodging" as seen by

the fact that Carter's grandmother had resided in the house before she died, it had the typical layout of a house, it contained appliances, and the utilities were hooked up and usable before the first fire. The State explained that the aggravated arson statute purposefully "uses the word habitable versus inhabited," meaning that "[t]he law does not require that somebody be living there full time and they just happen to not be home." The State then concluded that "if a business, if a trailer, if a railway car, a watercraft, or an aircraft can constitute a habitable structure under the law, then this home surely constituted a habitable structure."

¶14   Trial counsel countered, arguing,

> I want you to focus on the word . . . "used." It doesn't say what it's usually used for or what it's been used for in the past. It doesn't say what it's going to be used for in the future. It's, used. . . . [W]e all know what that word means, but just focus on that while we're going forward.
>
> You heard . . . testimony from the State about the condition of the property. You heard . . . the fire inspector talk about [how] he's seen people live in worse places than this building. That's going to condition. We're not talking about condition. This statute is talking about use. . . . [T]he condition of the property is irrelevant. It's the use of the property. What was the property being used for?
>
> Fire inspector said he's seen people living in . . . other places worse than that after fires. Well, he didn't ever say that he saw people using it for lodging or assembling people or doing business.

Trial counsel concluded by stating that all that was relevant was "the actual use of this property, this structure, at this time," and that it was undisputed that no one had used the house for lodging for many years.[4]

¶15 After closing argument, the case was submitted to the jury, which found Carter guilty of aggravated arson. Carter appeals.

ISSUES AND STANDARD OF REVIEW

¶16 Carter raises two issues for our consideration. First, he asserts that trial counsel was ineffective for failing to object to the fire marshal's testimony regarding the house's habitability. Second, he asserts that trial counsel was ineffective for failing to move for a directed verdict when the State rested its case. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *Layton City v. Carr*, 2014 UT App 227, ¶ 6, 336 P.3d 587 (quotation simplified).

---

4. It is not clear from the record how long the house sat vacant. But it is clear that it was vacant for a significant amount of time. Carter's cousin took possession of it in July 2017, and he began to slowly repair the dilapidated house, but he had never stayed a single night in the house by the time of the fires in late 2018. Carter's cousin also could not remember "the last time anyone did stay overnight" at the house. Additionally, a police officer testified that he had not "notice[d] anybody living there in the last couple years."

ANALYSIS

I.

¶17    There is no getting around the fact that Utah's aggravated arson statutory scheme is potentially contradictory. It begins reasonably enough, providing in relevant part, "A person is guilty of aggravated arson if by means of fire or explosives he intentionally and unlawfully damages . . . a habitable structure[.]" Utah Code Ann. § 76-6-103(1) (LexisNexis 2017).

¶18    The term "habitable" is commonly understood to mean "capable of being lived in." *See Habitable*, Merriam-Webster, https://www.merriam-webster.com/dictionary/habitable [https://perma.cc/KM2G-SF64]. This meaning of the term is likely what the fire marshal had in mind in saying that the structure Carter burned was habitable. But our Legislature did not leave "habitable" statutorily undefined. Instead, it added its own definition. But the definition chosen by the Legislature does not track the commonly understood definition of the term; it changes it: "'Habitable structure' means any building, vehicle, trailer, railway car, aircraft, or watercraft used for lodging or assembling persons or conducting business whether a person is actually present or not." Utah Code Ann. § 76-6-101(1)(b).

¶19    One purpose behind our Legislature's doing so is clear. It meant to expand the reach of the statute beyond traditional housing structures to a broad array of "structures" where arson might put occupants, or potential occupants, at risk. In an apparent effort to scale back that expansive reach somewhat, it then added the qualification that the target of the fire or explosion must be "used for lodging or assembling persons or conducting business." *Id.* The idea seems to be, for example, that if an individual lights a WaveRunner on fire, the crime is simple arson, not aggravated arson, whereas if a houseboat or even a sailboat in which the owner frequently spends the weekend is burned, it is aggravated arson.

¶20 While that seems reasonable enough, the "used for" qualifier employed by our Legislature in the definition is not restricted to the less typically inhabited items—vehicles, trailers, railway cars, aircraft, and watercraft—but also applies to buildings. On its face, then, the statute suggests that to establish aggravated arson, it is not enough that the building is "capable of being lived in." *See Habitable*, Merriam-Webster. Rather, it must have been "used for lodging or assembling persons or conducting business." Utah Code Ann. § 76-6-101(1)(b). The long-vacant house Carter burned was not being used in any of these ways at the time of the second fire, and this was the basis for Carter's argument that while the house may have been "habitable" as that term is commonly understood, it was not "habitable" as that term is specifically defined in the statute.

¶21 Given this conundrum, our Legislature may well wish to revisit this provision. But any such future amendment will not aid our solution of the case before us, which we must decide on the basis of the statute as it now exists, warts and all, and the district court's ruling on how it would instruct the jury in this case.

II.

¶22 We now turn to Carter's ineffective assistance of counsel claims. An ineffective assistance claim requires a defendant to prove both that (1) "counsel's performance was deficient" and (2) "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "A defendant's inability to establish either element defeats a claim for ineffective assistance of counsel." *State v. Cruz*, 2020 UT App 157, ¶ 17, 478 P.3d 631 (quotation simplified).

¶23 To establish deficient performance, i.e., that trial counsel's actions "fell below an objective standard of reasonableness," the defendant must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable

professional assistance." *Strickland*, 466 U.S. at 688–89. Indeed, "even if an [act or] omission is inadvertent and not due to a purposeful strategy, relief is not automatic." *State v. Ray*, 2020 UT 12, ¶ 34, 469 P.3d 871 (quotation simplified). Instead, "even if a court concludes that counsel made an error, the ultimate question is always whether, considering all the circumstances, counsel's acts or omissions were objectively unreasonable." *State v. Scott*, 2020 UT 13, ¶ 36, 462 P.3d 350.

¶24 To establish prejudice, "a defendant must present sufficient evidence to support a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Archuleta v. Galetka*, 2011 UT 73, ¶ 40, 267 P.3d 232 (quotation simplified). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

A.    The Fire Marshal's Testimony

¶25 Carter asserts that "counsel was objectively unreasonable when he did not object to the [fire marshal's] opinion that the house was a 'habitable structure.'"[5] Specifically, Carter contends

---

5. Carter also argues that trial counsel was ineffective for "not object[ing] when the [fire marshal] impermissibly broadened the meaning of the statutory phrase 'habitable structure.'" To support this contention, Carter undertakes an extremely thorough analysis with the assistance of corpus linguistics, dictionaries, and case law of the phrase "used for" in the statutory definition of "habitable structure" to establish that the statute defines these structures based on their current use. He does this in an attempt to establish that "[b]y focusing on what the structure could have been used for" rather than what it was actually used for at the time of the second fire, the fire marshal "improperly expanded the statutory definition from the ongoing use that the statute required," and therefore counsel was

(continued…)

that counsel performed deficiently because the fire marshal's testimony contained "an impermissible legal conclusion" "of whether the house was a habitable structure." Carter explains that "[f]ailing to object to expert testimony improperly opining on the only legal conclusion that matters is not a defensible course of action." But counsel is not required "to correct every error that might have occurred at trial." *Ray*, 2020 UT 12, ¶ 32. Rather, counsel is required only to act reasonably and, assuming

---

(…continued)

ineffective for not objecting to his testimony on this basis. We ultimately need not resolve Carter's preferred interpretation of the statutory scheme because we conclude in section IIA that, based on the posture of the case and the district court allowing the parties to present their own interpretations of "habitable structure" to the jury, counsel's actions were not unreasonable in forgoing an objection to the fire marshal's testimony. After all, trial counsel was able to cross-examine the fire marshal and counter that testimony with his own interpretation that the house had to be currently used for lodging to qualify as a habitable structure. Counsel also elicited an acknowledgement from the fire marshal that the structure was not being used for lodging when Carter set fire to it. Had Carter directly challenged on appeal the court's denial of his proposed jury instruction containing his preferred interpretation of the statutory scheme, then the statutory meaning would be directly before us, and we would have to wade into this debate. But because we consider Carter's appeal only through the lens of ineffective assistance of counsel, we are limited to determining whether trial counsel acted reasonably in what he did, and we have no occasion to undertake such a thorough analysis and interpretation of the true meaning of the admittedly confusing statutory scheme. *See State v. Scott*, 2020 UT 13, ¶ 36, 462 P.3d 350 ("[T]he ultimate question is always whether, considering all the circumstances, counsel's acts or omissions were objectively unreasonable.").

that the fire marshal's testimony was impermissible,[6] we can determine that reasonable counsel could have decided to cross-examine the fire marshal in this situation rather than object and move for the testimony to be stricken.

¶26    Here, the complained-of testimony came at the end of the fire marshal's direct examination. Immediately after this statement, trial counsel began his cross-examination and elicited from the fire marshal that the basis for his conclusion the house was habitable was simply the fact that it "was livable" even though no one actually lived in the house at the time of the second fire. Trial counsel also got the fire marshal to explain that he called the house a habitable structure based on his "general common sense"; his experience over the years and seeing "what people are willing to live in"; and the fact that this house had been "built to be a habitable structure." The fire marshal also explained that he had "seen structures that were considerably more damaged than [this house was by the first fire] that people have moved back into." Thus, through cross-examination, trial counsel was able to elicit testimony from the fire marshal

---

6. "Rule 702 of the Utah Rules of Evidence permits expert testimony if it 'will help the trier of fact to understand the evidence or to determine a fact in issue.'" *State v. Brown*, 2019 UT App 122, ¶ 28, 447 P.3d 1250 (quoting Utah R. Evid. 702(a)). "Such testimony is not rendered inadmissible purely on the basis that it offers an opinion on an 'ultimate issue' to be decided by the jury." *Id.* (citing Utah R. Evid. 704(a)). But "opinions that tell the jury what result to reach or give legal conclusions [are] impermissible under rule 704." *State v. Davis*, 2007 UT App 13, ¶ 15, 155 P.3d 909 (quotation simplified). For purposes of our analysis, we assume, without deciding, that the fire marshal's testimony was impermissible but ultimately conclude that trial counsel acted reasonably in attempting to undermine the testimony through cross-examination rather than through an objection.

suggesting he meant only that the house was capable of being lived in and was not opining with reference to the peculiar statutory definition applicable in this case. In other words, trial counsel was able to get the fire marshal to explain that he was using the word "habitable" as it is commonly understood and not as it is used in the statute—at least under trial counsel's interpretation. Thus, trial counsel's cross-examination made the jury well aware of the limits of the fire marshal's testimony.

¶27 Trial counsel also had the opportunity to explain this strategy when he told the court that he did not object to the fire marshal's conclusion that the house was capable of being lived in because his focus was on "what was it being used for at that time." Based on this strategy, trial counsel's cross-examination was reasonable because he elicited testimony that the house was vacant at the time of the second fire. This testimony supported trial counsel's definition of a "habitable structure" under the statute. And given the fact that the court had authorized the parties to argue their own definitions of "habitable structure" and whether the house fit that definition, it was reasonable for counsel not to object and instead to attempt to elicit testimony from the fire marshal on cross-examination that would establish that the house was not currently in use—the very key to trial counsel's strategy.

¶28 The reasonableness of trial counsel's performance is further seen in his closing argument. There, he argued that the fire marshal's testimony about the house generally being capable of being lived in was "irrelevant" because under the statute, properly understood, all that mattered was whether the house was being lived in at the time of the second fire, which the fire marshal said was not the case. Thus, "considering all the circumstances," we cannot say that "counsel's acts or omissions were objectively unreasonable" in relying on cross-examination of the fire marshal to attempt to establish the defense's theory of the case rather than objecting outright. *See State v. Scott*, 2020 UT 13, ¶ 36, 462 P.3d 350.

B.     Directed Verdict

¶29    Carter asserts that "[o]bjectively reasonable trial counsel would have moved for a directed verdict when the State presented no evidence of ongoing use of the house because ongoing use is what the statutory definition of habitable structure requires." We disagree for two reasons.

¶30    First, "[i]n this case, [Carter] cannot establish either deficient performance or prejudice, because a motion for a directed verdict had no chance of success." *See State v. Makaya*, 2020 UT App 152, ¶ 9, 476 P.3d 1025, *cert. denied*, 481 P.3d 1039 (Utah 2021). "A futile motion necessarily fails both the deficiency and prejudice prongs of the *Strickland* analysis because it is not unreasonable for counsel to choose not to make a motion that would not have been granted, and forgoing such a motion does not prejudice the outcome." *Id. See also State v. Jordan*, 2021 UT 37, ¶ 27, 493 P.3d 683 (rejecting the defendant's "ineffective assistance of counsel claim on the ground that any objection to the prosecutor's statements at closing argument would have been futile").

¶31    Here, a motion for a directed verdict premised on the fact that the State could not prove that the house was being used at the time of the second fire would have been futile because the district court had already indicated its disagreement with that theory, at least as a matter of law. Specifically, when the parties were arguing how the jury should be instructed regarding the meaning of "habitable structure," trial counsel proposed to instruct the jury that it meant ongoing use. And the State argued for its preferred definition premised on the more familiar meaning of "habitable." The court declined to adopt either version urged by the attorneys and instead instructed the jury using the exact language found in section 76-6-101(1)(b), leaving both sides to argue their competing definitions to the jury. This approach left trial counsel free to argue to the jury that ongoing use of the house was required under the statutory definition of

"habitable structure" in section 76-6-101(1)(b). Thus, while the court permitted trial counsel to argue his interpretation, it would have been abundantly clear to counsel that because the court had previously denied an instruction to the jury directing that ongoing use was required, it would not have granted a directed verdict motion premised on the State's inability to prove ongoing use.

¶32    Therefore, because such a directed verdict motion would have been futile, as well articulated by Judge Tenney in his concurring opinion, trial counsel did not act unreasonably in declining to pursue it. *See Makaya*, 2020 UT App 152, ¶ 9. And Carter cannot show prejudice from trial counsel declining to pursue a futile motion.

¶33    Second, trial counsel did not perform deficiently in forgoing a directed verdict motion. Given the district court's earlier ruling on the statutory definition of "habitable structure"—that it did not require the State "to show it's being actually lived in"—counsel could have reasonably seen a potential risk that in the discussion that would follow such a motion, the court might be prompted to curb counsel's ability to make his argument to the jury that the house had to be in continual use to be considered habitable. *See generally Strickland v. Washington*, 466 U.S. 668, 695 (1984) (stating that "the idiosyncracies of [a] particular decisionmaker" can "enter[] into counsel's selection of strategies and . . . may thus affect the performance inquiry"). Given this, we cannot say that counsel was "objectively unreasonable" in forgoing this motion for a directed verdict under the circumstances. *See State v. Scott*, 2020 UT 13, ¶ 36, 462 P.3d 350.

CONCLUSION

¶34    Trial counsel did not perform deficiently when he did not object to the fire marshal's conclusion that the house was a

habitable structure because it was reasonable to address the fire marshal's testimony through cross-examination. Additionally, Carter has not shown that trial counsel performed deficiently, or that he was prejudiced, when trial counsel did not move for a directed verdict based on his preferred definition of habitable structure.

¶35 Affirmed.

_____

TENNEY, Judge (concurring):

¶36 I join the majority opinion in full. I write separately to elaborate on why I believe that Carter did not receive ineffective assistance when his counsel did not move for a directed verdict.

¶37 As discussed, Carter faults his counsel for not making a directed verdict motion. According to Carter, that motion should have been based on the assertion that the home could not qualify as a "habitable structure" under the controlling statute because it was not being used for lodging at the time that Carter burned it.

¶38 Several things complicate our consideration of this question. First, Carter's argument largely turns on the statutory definition of the term "habitable structure." But this definition has not been analyzed in any depth by Utah's appellate courts, and as the majority opinion points out, the statutory language is arguably problematic. Second, in its appellate brief, the State doesn't give us a substantive argument about its preferred interpretation of the statute. Instead, as is its right, it asks us to affirm on futility and reasonable performance grounds alone. And third, this is not the usual missing-motion case in which we don't know what the district court would have done if counsel had made the motion; rather, as I discuss below, I believe that the record shows that the district court would have denied the motion if Carter's counsel had made it.

¶39   Even so, the majority opinion rejects Carter's ineffective assistance claim on two grounds: first, because the motion would have been futile; and second, because defense counsel had a reasonable basis for not making it. Again, I join both aspects of that opinion.

¶40   The dissent, however, disagrees. In the dissent's view, "the futility of a directed verdict motion cannot be determined without analyzing the merits of that motion" ourselves. *Infra* ¶ 62. Because the State has not given us a competing interpretation of the habitable structure definition, the dissent suggests that our hands are tied. *Infra* ¶¶ 62, 69. According to the dissent, the State's silence should therefore essentially compel us to conclude that the motion would have been meritorious by default and, as a result, that defense counsel was ineffective for not making it. *Id.*

¶41   On the question of how a futility analysis ordinarily works, I respect where the dissent is coming from. And so far as I can tell, the dissent is correct that our futility cases have commonly turned on our own assessment of the missing motion's merits.

¶42   Unlike the dissent, however, I don't regard this as a prescriptive rule. Rather, I believe that it's primarily a feature of how these cases usually come up. When a defendant claims that his counsel was ineffective for not making a particular argument, we normally don't have a clear statement from the district court indicating what it would have done with the argument if it had been made, and the reason for that is that the district court was never presented with it in the first instance. Hence, the ineffective assistance claim.

¶43   But that's not what happened here. Again, Carter faults his counsel for not making a directed verdict motion that would have been based on his preferred interpretation of the habitable structure statute. What makes this case somewhat atypical from

an ineffective assistance standpoint, however, is that the district court had already been presented with that very interpretation earlier when the defense requested a jury instruction that was based on it. And when the court heard this interpretation, it expressed its clear disagreement with it. The court opined that "[y]ou don't have to show" that the home is "being actually lived in" for the home to qualify as a habitable structure, and the court also said that, in its view, a home that was "just built" and "nobody's moved into it yet" would qualify. The court expressed a similar view later, explaining that it believed the statute doesn't turn on "whether [the home] was actually being occupied at the time."

¶44    Carter has not given us any reason to believe that shifting from the jury instruction context to the directed verdict context would have changed the court's mind about how the controlling statute works. Given this, Carter is essentially faulting his counsel for not repurposing an already-rejected argument into a new form, even though there was no appreciable likelihood of obtaining any different result.

¶45    In the dissent's view, however, what ends up mattering for futility purposes are the merits of the motion, which, in the dissent's view, turns on how we would decide this question on appeal. *See infra* ¶¶ 66–67. But unlike the dissent, I don't believe that a futility analysis is necessarily that limited.

¶46    An ineffective assistance claim stems from the Sixth Amendment, and the "standards for adjudicating such claims are thus a matter of federal law." *State v. Silva*, 2019 UT 36, ¶ 20, 456 P.3d 718. As a matter of federal law, a Sixth Amendment ineffective assistance claim has two elements: deficient performance and prejudice. *See State v. Drommond*, 2020 UT 50, ¶ 51, 469 P.3d 1056.

¶47    Utah's cases have never treated futility as a standalone third element. Rather, they've offered futility as the reason (or,

perhaps, as a shorthand descriptor) for why one of the two ineffective assistance elements was not established in a particular case. If the missing motion was futile, for example, then defense counsel didn't perform deficiently by not making it. Or, similarly, if the missing motion was futile, then the defendant wasn't prejudiced by its absence.

¶48    In this sense, futility is not the analytical end; rather, it's the means to the analytical end. So when futility is invoked, the endpoint inquiry remains the same: has the defendant shown that he received ineffective assistance? *Cf. State v. Scott*, 2020 UT 13, ¶ 35, 462 P.3d 350 ("[T]he ultimate question is not whether there was a possible strategic reason for counsel's conduct, but instead whether that conduct was objectively reasonable.").

¶49    The ineffective assistance inquiry then turns on the reasonableness of counsel's conduct. *See Strickland v. Washington*, 466 U.S. 668, 688 (1984). And when assessing whether counsel performed reasonably, we must begin with how things looked to counsel at the time the decision in question was made. As explained by the Supreme Court in *Strickland*, we must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct," *id.* at 690, and we must also make "every effort . . . to eliminate the distorting effects of hindsight," *id.* at 689.

¶50    This largely explains why I disagree with the dissent about how we must assess futility in a case like this one. If a district court has already considered and rejected a particular argument, I don't see why we would be prevented from taking that into account when assessing whether defense counsel acted reasonably by not re-raising that same argument later. Since defense counsel at the time would have necessarily considered the court's prior ruling or statements, I think we can too. *See id.* at 690 ("The court must then determine whether, *in light of all the circumstances*, the identified acts or omissions were outside the

wide range of professionally competent assistance." (Emphasis added.)).

¶51    I therefore disagree with the dissent's view that, when assessing futility, we're limited to our own post-hoc assessment of the "merits of the motion" in question. *See infra* ¶¶ 66-67. I do agree that this would be one way for us to analyze futility in a case. After all, if we have examined the issue and we have concluded that a proposed motion would have been meritless, then that would certainly suggest that defense counsel below could have reasonably decided not to make it.

¶52    But I don't believe that this is the only way we can assess futility. Put differently, I don't regard this as an either/or proposition. In my view, a missing motion could be deemed futile if we later conclude that it was meritless. But since an ineffective assistance analysis calls for an assessment of the reasonableness of defense counsel's conduct, I believe that a motion could also be deemed futile if the district court itself had already considered and rejected it. In such a case, if counsel has already lost once on an argument, I don't believe that counsel is constitutionally obligated to then lose twice.

¶53    Even if it's true, however, that the latter scenario falls outside our traditional "futility" rubric, I don't believe that the outcome of this particular appeal must turn on that discrete question of labeling. Again, what ultimately matters is the reasonableness of counsel's performance. *Strickland*, 466 U.S. at 688. And here, I agree with the State that defense counsel's performance was reasonable.

¶54    Defense counsel had no real basis for arguing that Carter did not set the fire. There was circumstantial evidence tying Carter to the fire, and Carter also confessed to starting it in a recorded interview. Because of this, the most viable defense appeared to be that Carter had not committed aggravated arson because the home that he burned did not qualify as a "habitable

structure" under the statute. And if counsel had managed to secure an acquittal on the aggravator, this could have resulted in a substantial reduction in Carter's sentence. *Compare* Utah Code Ann. §§ 76-6-103(2), 76-3-203(1) (LexisNexis 2017) (setting forth a sentencing range of five years to life for aggravated arson), *with id.* § 76-3-203(2) (setting forth a sentencing range of one to fifteen years for second degree felony arson).

¶55    As noted, the district court had already expressed its own disagreement with the defense's proposed interpretation. And yet, as also noted, the court nevertheless still decided to allow defense counsel to make this argument to the jury.[7]

---

7. The dissent suggests that because the district court allowed defense counsel to make the argument to the jury, this means that the court didn't actually reject the defense's view of this statutory definition. *See infra* ¶ 72. I do see this as a somewhat curious decision by the court. As I read the record, however, it seems that the court was simply trying to thread the needle after being confronted with an ambiguous statutory provision that had not yet been interpreted by an appellate court and could at least arguably be viewed as presenting a factual question.

Unlike the dissent, however, I'm convinced that the district court's prior statements were clear enough to show that it did disagree with the defense's view of this definition—and, necessarily, to also communicate to defense counsel that the court would have rejected any directed verdict motion that would have been predicated on that interpretation.

After all, consider the way that Carter frames his own proposed argument in his appellate brief. There, Carter faults his prior counsel for not moving for a directed verdict based on the State's failure to present evidence "of the *ongoing* use of the house for lodging and assembling." (Emphasis added.) As he now puts it, the aggravated arson statute only applies to a

(continued…)

¶56    Given the centrality of this issue to the defense, the court's decision to allow counsel to make this argument to the jury was a critical concession. After all, to avoid an aggravated arson conviction, Carter needed to convince someone who mattered that the home that he burned didn't qualify as a "habitable structure." The court had already said that it wasn't personally convinced. But by allowing counsel to make the argument to the jury anyway, the court was still giving counsel the chance to make that argument to someone who could do something with it.

¶57    So why do anything that could even potentially upend this delicate and necessary gain? Since defense counsel already knew that the district court disagreed with the defense's interpretation of the statute, I believe that counsel could reasonably decide that it wouldn't be a good idea to prompt the court to say so again on the record. Among others, counsel could reasonably have wondered whether doing so might cause the

---

(…continued)

structure that "is *currently* or *presently* used for lodging, assembling, or conducting business." (Emphases in original.)

But again, during the jury instruction conference, the court said that it thought the statute would apply to a home that was "just built" and "*nobody's moved into it yet*." (Emphasis added.) The court also said that it believed the statute doesn't turn on "whether [the home] was *actually being occupied at the time*." (Emphasis added.)

If the district court was correct in its on-the-record view that a just-built home with no current occupants would qualify, then Carter can't be correct that the statute only applies to a home that is "currently" subject to "ongoing" occupancy. So the court's prior comments do indeed seem to me to be a rejection of the argument that Carter is now faulting his counsel for not making a second time through the guise of a directed verdict motion.

court to rethink its decision to allow counsel to make the argument to the jury at all.[8]

¶58 So in the end, I'm comfortable calling this a case of futility. After all, given the district court's prior comments, the directed verdict motion Carter proposed on appeal would have been decidedly quixotic on the ground, so I don't believe that the Constitution required counsel to fight that losing fight again. But for similar reasons, because Carter's ineffective assistance claim ultimately turns on whether defense counsel acted reasonably, I also agree with the majority opinion that Carter's claim fails on its own terms. Defense counsel knew at the time that the district court didn't agree with the defense about how to interpret that statute, and yet the court had left the door open for the defense

---

8. The dissent suggests that counsel still should have moved for a directed verdict to preserve that issue for appeal. *Infra* ¶ 78. But futility operates as "an exception to the general requirement of preservation." *State v. Ashcraft*, 2015 UT 5, ¶ 33, 349 P.3d 664; *see also State v. Rothlisberger*, 2004 UT App 226, ¶ 29, 95 P.3d 1193 ("Under our law, parties are not required to make futile objections in order to preserve a future claim."). Because the court had already considered and rejected the defense's proposed interpretation of the statute, I don't believe that counsel had any further obligation to advance that same interpretation in a new form just to preserve the argument for appellate review.

Regardless, even if there could have been some gains on the preservation front, one of the things that defense counsel are allowed to do is "pick [their] battles." *State v. Ray*, 2020 UT 12, ¶ 32, 469 P.3d 871. Here, a potential victory on appeal wasn't guaranteed, and that possibility was years removed anyway. I don't believe that this possibility constitutionally obligated counsel to make a potentially risky motion at trial, particularly where that motion would have been premised on an argument that the district court had already considered and rejected.

to make that pitch to the jury anyway. Under these circumstances, I believe that counsel could reasonably decide to leave well enough alone, accept the court's invitation to take this case to the jury, and push for an acquittal there. While there may be some room for disagreement about whether this was the best approach, I don't believe that counsel acted unreasonably by taking this one.

¶59   With these additional observations, I concur in the majority opinion.

———————

HAGEN, Judge (dissenting):

¶60   I respectfully dissent because I do not share the majority's view that trial counsel's failure to move for a directed verdict was objectively reasonable. Under the unique circumstances presented by both the record below and the briefing on appeal, I would conclude that Carter has satisfied his burden of persuasion to show both deficient performance and prejudice under *Strickland*. *See Strickland v. Washington*, 466 U.S. 668, 695 (1984). Because Carter has established his ineffective assistance of counsel claim, I would reverse and remand for a new trial.

¶61   The State has argued that trial counsel's failure to move for a directed verdict did not constitute deficient performance because the motion would not have been granted by the district court. The State bases that argument not on the merits of the motion, but on the perceived receptiveness of the judge. According to the State, "A reasonable attorney could conclude that the judge who had already ruled that [the defense] theory that 'habitable structure' means 'actual use' was a matter of argument for the jury was not going to take the case from the jury on that basis." The majority opinion agrees with the State that a directed verdict motion would have been futile because "it would have been abundantly clear to counsel that because the court had previously denied an instruction to the jury directing that ongoing use was required, it would not have granted a

directed verdict motion premised on the State's inability to prove ongoing use." *Supra* ¶ 31.

¶62 On the record and briefing before us, I cannot agree that a directed verdict motion would have been futile. In my view, the futility of a directed verdict motion cannot be determined without analyzing the merits of that motion. And because the State has not rebutted the merits of Carter's statutory interpretation argument, I cannot conclude that a motion for a directed verdict would have been futile.

¶63 To establish his ineffective assistance of counsel claim, Carter must "show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense." *See State v. Gallegos*, 2020 UT 19, ¶ 33, 463 P.3d 641 (cleaned up). Because the State has not contested Carter's showing on the prejudice prong, our analysis is limited to the question of whether trial counsel's performance was objectively deficient. As the concurrence correctly observes, futility is not "a standalone third element." *Supra* ¶ 47. Instead, Utah cases have "offered futility as the reason (or, perhaps, as a shorthand descriptor) for why one of the two ineffective assistance elements was not established in a particular case." *Supra* ¶ 47. Specifically, "[a] futile motion necessarily fails both the deficiency and prejudice prongs of the *Strickland* analysis because it is not unreasonable for counsel to choose not to make a motion that would not have been granted, and forgoing such a motion does not prejudice the outcome." *State v. Makaya*, 2020 UT App 152, ¶ 9, 476 P.3d 1025.

¶64 In this context, a "futile" motion means a motion that had "no chance of success." *Id.* Used in this way, futility short-circuits the *Strickland* analysis. If the defendant could not prevail on the motion, it is a foregone conclusion that failure to make that motion does not rise to the level of ineffective assistance of counsel under *Strickland*.

¶65    The conclusion that a motion was futile operates much like the conclusion that there was a strategic reason for counsel's actions. "If it appears counsel's actions could have been intended to further a reasonable strategy, a defendant has necessarily failed to show unreasonable performance." *State v. Ray*, 2020 UT 12, ¶ 34, 469 P.3d 871. Similarly, if the motion was futile, the defendant has necessarily failed to show unreasonable performance, because choosing not to make a motion on which the defendant could not have prevailed is reasonable per se. *See State v. Baer*, 2019 UT App 15, ¶ 7, 438 P.3d 979 (recognizing that "trial counsel's decision not to raise a futile motion for a directed verdict would not be deficient performance" (cleaned up)). But that conclusion does not automatically follow if, by "futile," we mean only that the judge presiding over the case was unlikely to grant it. That fact might be highly relevant to whether counsel's choices were objectively reasonable under the circumstances, but it does not mean that the omission was necessarily reasonable.

¶66    Accordingly, we cannot use a motion's futility as shorthand for reasonable performance without examining the merits of the motion. When assessing whether the motion would have been futile, we must assume that the district court, when squarely presented with the issue, would have gotten the law right. *See State v. Bell*, 2016 UT App 157, ¶ 23, 380 P.3d 11 ("We conclude that under correct application of the law, . . . a motion to merge would have been successful, not futile."). And, if not, such a preserved error could be rectified on appeal.[9]

---

9. The concurring opinion suggests that, in my view, the only thing that matters for futility purposes is "how we would decide this question on appeal." *Supra* ¶ 45. That is not my position. In evaluating deficient performance, "the reasonableness of counsel's challenged conduct must be judged on the facts of the particular case, viewed as of the time of counsel's conduct." *State v. Ray*, 2020 UT 12, ¶ 31, 469 P.3d 871 (cleaned up). But when our

(continued…)

¶67 Such an approach is consistent with our caselaw. When determining whether a motion would have been futile, Utah appellate courts invariably analyze the merits of the motion. *See, e.g., State v. Eyre*, 2021 UT 45, ¶ 21 ("To determine whether trial counsel performed deficiently in failing to object to [the jury instruction], we must decide if the instruction was, in fact, erroneous."); *State v. Alfatlawi*, 2006 UT App 511, ¶ 43, 153 P.3d 804 ("Because we hold that [the statute] is not unconstitutional, we conclude that trial counsel did not perform ineffectively for failing to challenge the enhancement."). The only instance in which we consider the trial judge's perceived receptiveness to the argument is when the judge has discretion in making the ruling. *See, e.g., State v. Whytock*, 2020 UT App 107, ¶ 38, 469 P.3d 1150 (motion for a mistrial); *State v. Gunter*, 2013 UT App 140, ¶ 35, 304 P.3d 866 (motion for a continuance). We have never concluded that a motion would have been futile without regard to the merits of the motion and the degree of discretion afforded to the district court.

¶68 In the directed verdict context, it is objectively reasonable to forgo a futile motion. *Baer*, 2019 UT App 15, ¶ 7. On the other hand, "[i]f the State presents no competent evidence from which

---

(…continued)

conclusion that counsel's conduct was objectively reasonable is based solely on the fact that the missing motion was futile, we must necessarily consider the merits of that motion. When dealing with a purely legal issue, considering the merits does not require us to speculate about how the issue would have been decided, either at trial or on appeal. Rather, the question is whether the defendant was entitled to prevail as a matter of law. If so, the motion cannot be considered futile. We might still conclude that it was reasonable for counsel to forgo the motion based on all of the circumstances facing trial counsel at the time, but, unlike failure to raise a futile motion, that choice is not reasonable per se.

a reasonable jury could find the elements of the relevant crime, then trial counsel should move for a directed verdict and the failure to do so . . . likely constitute[s] deficient performance." *Id.* (cleaned up). In other words, whether a motion for directed verdict would be futile necessarily depends on the merits of that motion. This is why Utah appellate courts have never concluded that a directed verdict motion would have been futile without examining whether the evidence was indeed sufficient to support a conviction. *See, e.g.*, *State v. Cruz*, 2020 UT App 157, ¶ 26, 478 P.3d 631; *Makaya*, 2020 UT App 152, ¶ 18; *Baer*, 2019 UT App 15, ¶ 14; *State v. Kirby*, 2016 UT App 193, ¶ 18, 382 P.3d 644; *State v. Featherhat*, 2011 UT App 154, ¶ 36, 257 P.3d 445.

¶69    In this case, I cannot conclude that a directed verdict motion would have been futile because the State has not addressed the merits of Carter's argument. "[W]hen an appellee fails to present us with any argument, an appellant need only establish a prima facie showing of a plausible basis for reversal. This is a lower standard than the typical burden of persuasion on appeal." *AL-IN Partners, LLC v. LifeVantage Corp.*, 2021 UT 42, ¶ 19, 496 P.3d 76 (cleaned up). In this appeal, we have only Carter's unrebutted and facially persuasive arguments that the statute defines habitability by the structure's ongoing use and that the vacant house in this case does not meet that definition as a matter of law. That is enough to carry his burden of persuasion on this issue. *See Utah Dep't of Transp. v. Coalt, Inc.*, 2020 UT 58, ¶ 45, 472 P.3d 942 ("An appellant bears the burden of persuasion on appeal. But a court may rule in favor of an appellant for purposes of that case if the appellee inadequately briefs an argument and the appellant provides a plausible basis for reversal." (cleaned up)). Because the State has not refuted Carter's argument that the evidence was insufficient to prove aggravated arson as a matter of law, we should assume for

purposes of this appeal that he was entitled to a directed verdict.[10] Therefore, we cannot affirm on futility alone.

¶70 But that is not the end of the analysis. Even if we accept, for purposes of this appeal, that Carter was entitled to a directed verdict as a matter of law, it does not automatically follow that counsel's failure to make that motion fell below an objective standard of reasonableness. Although "a defendant has necessarily failed to show unreasonable performance" if the motion was futile, "the converse is not true." *See Ray*, 2020 UT 12, ¶ 34. If we cannot conclude that the directed verdict motion would have been futile, we must "still ask whether, in light of all the circumstances, the attorney performed in an objectively reasonable manner." *See id.* (cleaned up).

¶71 In my view, this is where we assess "how things looked to counsel at the time the decision in question was made." *Supra* ¶ 49. As *Strickland* recognizes, "the idiosyncra[sies] of the particular decisionmaker . . . may actually have entered into counsel's selection of strategies and, to that limited extent, may thus affect the performance inquiry." 466 U.S. at 695. We therefore consider the judge's predisposition as part of the totality of the circumstances facing defense counsel in real time and ask whether it would have been objectively reasonable for defense counsel to decide not to make the motion.

¶72 As an initial matter, I do not view the district court's jury instruction decision as a de facto rejection of Carter's argument.[11]

---

10. At the very least, Carter has shown that such a motion was arguably meritorious and thus cannot be characterized as futile.

11. The concurring opinion points out that futility is "an exception to the general requirement of preservation." *Supra* ¶ 57 n.8 (quoting *State v. Ashcraft*, 2015 UT 5, ¶ 33, 349 P.3d 664). It is not clear to me how that fits into the deficient performance

(continued…)

The State has accurately characterized the court's decision as ruling only "that [Carter's] theory that 'habitable structure' means 'actual use' was a matter for argument to the jury." Although the court expressed some skepticism during its exchange with counsel, it ultimately chose not to resolve the question and elected to simply provide the jury with the statutory definition. Significantly, the court expressly allowed counsel to argue Carter's interpretation to the jury, something that would have been improper if the court had in fact concluded that his interpretation was legally incorrect. Indeed, the court prohibited the defense from making "an improper argument" that Carter could not be convicted of aggravated arson because no one was actually present at the time of the fire—an argument that the court deemed foreclosed by the statutory language. *See* Utah Code Ann. § 76-6-101(1)(b) (LexisNexis 2017) (defining "habitable structure" without regard to "whether a person is actually present or not"). If the court had determined that the statutory language did not support Carter's present tense interpretation of "used for lodging," presumably the court would have prohibited him from making that argument, as well.

---

(…continued)

prong of the *Strickland* analysis. Perhaps an argument could be made that reasonable defense counsel—assuming that the exception would apply and Carter would be allowed to make an unpreserved challenge to the sufficiency of the evidence on appeal—might have deemed it unnecessary to make a directed verdict motion below. But the State has not advanced that argument on appeal and surely would resist the conclusion that trial counsel was excused from making a directed verdict motion under these circumstances. The district court never ruled on the statutory interpretation question and never suggested that it would not consider the matter further if properly raised outside the jury instruction context.

¶73 The district court's conservative decision to instruct the jury using the statutory definition of "habitable structure" signaled only that it was not inclined to further define "habitability" beyond the statutory definition provided by the legislature—a perfectly reasonable decision well within the court's discretion. *See State v. Kitzmiller*, 2021 UT App 87, ¶ 15, 493 P.3d 1159 ("The refusal to give a jury instruction is reviewed for abuse of discretion . . . and [we] will affirm when the instructions taken as a whole fairly instruct the jury on the law applicable to the case." (cleaned up)). By resolving the jury instruction question in this way, the district court avoided answering the statutory interpretation question that would have been squarely presented by a directed verdict motion.

¶74 The State has suggested no strategic reason why objectively reasonable trial counsel would have chosen to argue that issue to the jury instead of—rather than in addition to—the court. Even if the State is correct that reasonable counsel could have assumed that the court "was not going to take the case from the jury," there was no evident downside to making that motion. It cannot be a reasonable strategic choice to "leave well enough alone, accept the court's invitation to take this case to the jury, and push for an acquittal there," *supra* ¶ 58, when there is no reason that trial counsel could not have done both.

¶75 Although the State has not argued that a motion for a directed verdict carried any plausible downside, the majority and concurring opinions suggest that, once the court allowed the issue to be argued to the jury, counsel could have made a reasonable strategic decision to avoid "anything that could even potentially upend this delicate and necessary gain." *Supra* ¶ 57. The concurrence speculates, for instance, that "counsel could reasonably have wondered whether doing so might cause the court to rethink its decision to allow counsel to make the argument to the jury at all." *Supra* ¶ 57. Although this theory was not argued by the State, we are entitled to affirm the district court on any basis supported by the record, regardless of

whether that argument was raised in the briefs. *See Bailey v. Bayles*, 2002 UT 58, ¶ 10, 52 P.3d 1158. And if that scenario were supported by the record, I would agree that making such a choice would be a strategic decision virtually unassailable on appeal. But nothing in the record suggests that trial counsel had to make that choice here.

¶76 The district court's ruling on the proposed jury instructions would not have signaled to reasonable trial counsel that he risked losing his chance to argue the theory to the jury if he moved for a directed verdict on the same grounds. The court never suggested that allowing the defense to argue the theory to the jury was contingent on not pressing the issue further. To the contrary, the court's decision to allow counsel to argue the defense theory to the jury showed, at minimum, that the court did not believe that the statutory language foreclosed Carter's interpretation. The record does not readily support the conclusion that reasonable trial counsel in these circumstances would have believed that a directed verdict motion would forfeit the opportunity to argue the issue to the jury. Therefore, that alternative basis for affirmance is not apparent in the record.

¶77 But even if there was no conceivable strategic purpose for not making the motion, it does not automatically follow that trial counsel's omission fell below an objective standard of reasonableness. The lack of a purposeful strategy does not automatically entitle the defendant to relief. *Ray*, 2020 UT 12, ¶ 34. Rather, we must still assess whether the "omission fell below an objective standard of reasonableness." *Id.* ¶ 36. We must view trial counsel's decision in context to determine whether the issue "was sufficiently important under the circumstances that counsel's failure to" make the motion was objectively unreasonable. *Id.* ¶ 32. In other words, whether a directed verdict motion was "a battle that competent counsel would have fought." *Id.*

¶78    If failing to make a well-grounded directed verdict motion "likely constitute[s] deficient performance" in a typical case, *see Baer*, 2019 UT App 15, ¶ 7, then it certainly constitutes deficient performance under the circumstances presented here. Carter's defense hinged on whether the State had proven that the vacant house was a "habitable structure" within the meaning of the statute. Indeed, that was the only disputed issue at trial. It was not merely central to his defense; it was his entire defense. And if we assume, as we must on this briefing, that Carter's interpretation of the statute is at least arguably correct, then failure to seek a directed verdict on that basis—a strategy that would have at least preserved the issue for appeal—was objectively unreasonable.

¶79    The correct interpretation of "habitable structure" was not only Carter's entire defense, but also a purely legal question. Questions of law—such as "[t]he applicability, interpretation, and construction of a statute"—"are the exclusive province of the court and not for the jury to determine." *Durham v. Duchesne County*, 893 P.2d 581, 584 (Utah 1995). The evidence at trial established that the house had stood vacant for years, and whether those undisputed facts satisfied the statutory definition of "habitable structure" was a question of law most appropriately argued to the court. In addition, the district court is afforded no discretion on purely legal questions. So even assuming that the motion would have been denied, it was not objectively reasonable to forgo an arguably meritorious motion based solely on the judge's perceived inclinations when that legal ruling was subject to correction on appeal.

¶80    In sum, I would hold that we cannot conclude that a motion is futile simply because a particular judge would have denied it. We have to ask whether such a ruling would be correct, or at least sustainable on appeal. This necessarily requires examining the merits of the underlying motion, taking into account whether the district court had any discretion in the matter. Even if the record plainly demonstrates that the motion

would have been denied at trial, that motion would not be futile if the denial would have constituted reversible error on appeal. In such situations, failure to make the motion is not reasonable per se. Nor is it necessarily unreasonable. Rather, we must examine whether forgoing the motion constituted objectively deficient performance "based on the facts of the particular case, viewed as of the time of counsel's conduct." *Ray*, 2020 UT 12, ¶ 31 (cleaned up).

¶81 Because the State has not addressed Carter's argument that the evidence was insufficient to prove aggravated arson as a matter of law, we should assume for purposes of this appeal that he was entitled to a directed verdict. Under these circumstances, we cannot rely on futility to automatically conclude that the failure to make the motion was reasonable. And because, on this record, no reasonable trial counsel would have feared that a directed verdict motion would have foreclosed his opportunity to argue the theory to the jury, the decision to forgo the motion was not a reasonable strategic choice. Finally, in the context of this case, given the prominence of this issue at trial, its importance to Carter's defense, and the legal nature of the question presented, failure to make the motion was objectively unreasonable, thereby satisfying the deficient performance prong of his ineffective assistance of counsel claim. Because the State has not contested Carter's showing of prejudice, I would hold that Carter is entitled to a new trial.

_____